Sam WHITFIELD, Jr., Linda Whitfield, P.L. Perkins, Julious McGruder, Georgia M. Varner, Annie Sykes, Ollie Jennings, Sam Bennett, Plaintiffs,

v.

The DEMOCRATIC PARTY OF the STATE OF ARKANSAS, the State of Arkansas Democratic Central Committee, the Phillips County Democratic Central Committee, Defendants.

No. H–C–86–47.

United States District Court,
E.D. Arkansas, E.D.

May 20, 1988.

Olly Neal, Kathleen Bell, Marianna, Lani Guinier, Pamela S. Karlan, New York City, for plaintiffs.

Tim Humphries, Asst. Atty. Gen., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

EISELE, Chief Judge.

This case involves a challenge to Ark. Code Ann. § 7–7–202, which requires that a candidate receive a majority of the votes cast in a political party's primary election in order to obtain the nomination of that political party. That section provides in pertinent part:

> Whenever any political party shall, by primary election, select party nominees as candidates ... for any United States, state, district, county, township, or municipal office, the party shall hold a preferential primary election and a general primary election on the respective dates provided in section 7–7–202(a) and (b).

Without spelling it out the plaintiffs are actually attacking Amendment 29, Section 5 of the Constitution of Arkansas (adopted November 8, 1938) which provides:

> Only the names of candidates for office nominated by an organized political party at a convention of delegates, *or by a majority of all the votes cast for candidates for the office in a primary election,* or by petition of electors as provided by law shall be placed on the ballots of any election. (Emphasis Supplied)

The majority vote requirement is established by Amendment 29 and the mechanisms for carrying it out are set forth in section 7–7–202.

Plaintiffs are proceeding under two distinct theories. First, they contend that section 7–7–202 and Amendment 29 result in their being less able than white citizens to participate in the political process and elect the candidates of their choice. This cause of action arises, they state, entirely under section 2 et seq. of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 et seq. See Plaintiffs' Pretrial Brief, p. 2. Secondly, plaintiffs allege that section 7–7–202 and Amendment 29 were enacted and have been maintained for racially discriminatory reasons and, therefore, violate the fourteenth and fifteenth Amendments to the Constitution. The Court will deal with the latter contention first, i.e., plaintiffs' "intent" claims.

*Plaintiffs' Constitutional Claims.*

Plaintiffs rely upon the *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) and *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). Under this theory, plaintiffs must establish that section 7–7–202 and Amendment 29 were enacted, or has been maintained, for a discriminatory purpose. As stated in *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977):

> [D]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence as may be available."

In making this determination, the Court may consider the factors identified in the Senate Report along with all the other facts and circumstances. *See infra* discussion of section 2 of the Voting Rights Act of 1965. As the Court understands the law in this area, if legislation was motivated or maintained out of a desire to discriminate against blacks on account of their race and if, indeed, such legislation in fact has that effect, it would violate the Equal Protection clause. With these legal principles in mind, the Court will discuss the history of Amendment 29 and section 7–7–202.

Arkansas has had such a majority-vote requirement since 1933. Prior to that time, at least two counties in Arkansas followed the practice without the benefit of any act of the Legislature.

In his inaugural address in January 1933, Governor Futrell stated, "nominations for public office should be made by a majority of the qualified electors voting at an elec-

tion. By no means should an insubstantial minority be allowed to make a nomination." The bill was approved by the Senate by a vote of 28 to 0 on January 18, 1933, and passed the House by a vote of 84 to 3 on February 14. The Governor signed the bill and it became Act 38 of 1933.

Mr. Henry Alexander, in his article, "The Double Primary" in Volume 3 of the Arkansas Historical Orderly (1944) (cited by all parties and also by several of the witnesses) explained the overwhelming vote as follows:

In view of the potent opposition in the legislature to earlier bills providing a double primary, passage of Act 38 with only three negative votes is difficult to understand. The hectic Democratic primaries of 1932 may in some measure explain revival of agitation for the double primary system. The primary ballot of that year in Pulaski County, described as being "as long as your arm," contained seventy-six names exclusive of candidates for nomination to township offices and for election to party office. The ballot listed seven candidates for the gubernatorial nomination, a like number for the United States senatorial nomination. Six entrants sought the nomination for lieutenant governor and twenty candidates filed for seven other contested nominations to state office. Winners in several races failed to poll a majority of the votes case. J.M. Futrell, nominee for governor, polled less than forty-five per cent; Lee Cazort, nominee for lieutenant governor, less than thirty-one per cent. Converted to the principle of majority nominations by numerous minority nominations in the primaries of this and former years, a small group of influential citizens organized a Run–Off Primary Association. This short-lived organization was formed to advocate enactment of a double primary law at the 1933 session of the General Assembly. The organization, its headquarters in Little Rock, chose J. Bruce Streett, president, and Grady Forgy, secretary. Its officers had a hand in drafting Act 38 and its influence counted for much in obtaining passage of the statute.

During the 1935 legislative session, Act 38 was repealed. This prompted a movement to embody the majority-vote double primary system into the Arkansas Constitution where it would be beyond legislative power.

According to Mr. Alexander, in 1928, Mr. Brooks Hayes was runner-up in a seven-man race for the gubernatorial nomination which was won by Harvey Parnell with a plurality of less than 42%. Two years later, Mr. Hayes urged adoption of the double primary system in the form of an initiated amendment to the Constitution. Mr. Collins was at that time president of the Arkansas Bar Association. This effort culminated in the adoption of Amendment 29 to the Arkansas Constitution. The amendment covers a variety of "good government" election principles. For our purposes, the most important is found in Section 5, which reads:

Only the names of candidates for office nominated by an organized political party at a convention of delegates, or by a majority of all the votes cast for candidates for the office in a primary election, or by petition of electors as provided by law, shall be placed on the ballots in any election.

As stated by Alexander:

Sponsors of the proposed amendment were moved, primarily, by hostility to committee nominations and special elections and, secondarily, by hostility to plurality nominations. The latter, however, should not be minimized. The section of Amendment 29 requiring the double primary was included in earliest drafts of the proposal. Suggestions, at one time considered, to incorporate provision for a double primary in a separate amendment were discarded. Writing on August 31, 1937, Abe Collins stated, with reference to the section of the proposed amendment requiring the double primary, "I think it is the most important part of it (draft of Amendment 29)." Opposition to minority nominations was strengthened in some quarters when, in the primary of August 11, 1936, Carl E. Bailey won the gubernatorial nomination in a five-man race by a plurality of less than thirty-two percent of the votes cast.

Amendment 29 was laboriously drafted during a period of almost a year by Abe Collins, Judge B.E. Isbell of DeQueen, and Doctor Robert A. Leflar of Fayetteville. C.T. Coleman of Little Rock and Doctor J.S. Waterman of Fayetteville cooperated.

Dr. Leflar and Dr. Waterman are recognized nationally as legal scholars.

Over 18,000 signatures were needed in order to initiate Amendment 29. The effort was successful. According to Mr. Alexander:

The press of Arkansas vigorously and almost without exception supported ratification of Amendment 29 at the general election in November, 1938. No organized opposition appeared and, on November 8, the measure was approved by narrow margin of 63,414 to 56,947. Opposition to ratification was somewhat centered in so-called "machine" counties. In eleven counties often so characterized ratification was opposed by a popular majority of 61.5 per cent of votes cast in these counties.

Two temporary enabling acts were then passed.

In 1939, the Legislature proposed Amendment 30 to the Constitution which would have abolished the double primary. That proposal was defeated by a vote of 96,628 to 70,131, indicating, according to Alexander, a strengthening of public sentiment for the double primary system.

The first of the enabling acts under Amendment 29, Act 372 of 1939, required that uncontested nominations and nominations with only two contestants be voted on at the *second* primary. This provision was intended to lessen the opportunity for interference in the second race by winners or losers in the first, the preferential, race and to counteract lack of voter-interest and non-voting in the runoff primary. Since Act 372 expired by its own terms, it was necessary for the 1941 session of the General Assembly to reenact such enabling legislation. This was done and became Act 90 of 1941. This act also expired by its own terms causing the enactment of permanent enabling legislation in 1943, to wit:

Act 238 of 1943. Mr. Alexander's comments are pertinent:

The double primary system in Arkansas has had a checkered and stormy history. Opposition to the system is outspoken and lacks neither leadership nor strength. This writer ventures to predict, however, that this opposition will grow weaker; that the principle of majority nominations will become more secure.

Political parties in Arkansas in the state, district, county or city may nominate candidates either by party primary or by party convention. Optional use of the primary, authorized in 1895, was retained by authors of Amendment 29 to accommodate the Republican Party. Expense of a primary is unwarranted by the limited voting strength of the minority party. Optional use of the primary was retained also to allow Democratic nominations to be made by convention to fill vacancies in nominations. and to select candidates to run in special elections. Direct nominations in these circumstances would not be feasible in all cases.

Should a political party choose to nominate its candidates by primary such nominations, by provision of Amendment 29, must be made by majority vote. The wisdom of incorporating the mandate of majority nominations in the state's fundamental law, beyond reach of the General Assembly, is questionable. Objections stems from the likelihood that Arkansas may not remain a one-party state, as some authors of Amendment 29 tacitly assumed. Some profess to see national trends toward an alignment that may divide the electorate along political lines definitely liberal and conservative. Should this trend, or current frictions within ranks of the majority party in the southern states, usher in a two-party system in Arkansas, the constitutional requirement of majority nominations would invoke criticism. Meanwhile, the Republican Party, or any minority, is forced by Amendment 29 to select nominees either at party convention or to incur expense of two primaries.

The principle of majority rule, on the other hand, is a bed-rock ingredient of

democratic political philosophy. The principle, in one-party states, is ample support for the view that constitutional law should sanction majority nominations. The General Assembly may not amend the requirement of nomination by majority vote; in enabling acts it may exercise broad discretion in giving form and effect to the constitutional mandate.

Plaintiffs maintain, as pointed out above, that the primary runoff laws of Arkansas "were enacted and have been maintained for racially discriminatory reasons." Plaintiffs' Pretrial Brief, p. 2. Plaintiffs acknowledge, as they must, that during the period discussed above, when such laws came into being in Arkansas, black citizens had already been essentially disenfranchised and removed from any participation in Democratic primaries. And, since nomination in Democratic primaries at that time was tantamount to election, blacks were essentially excluded from any meaningful participation in the entire political life of the state. "All white" primaries and the poll tax had reduced black voter registration, according to one authority, to 1.5 per cent in 1940. *See,* "Runoff Primaries and Black Political Influence," by Harold W. Stanley, p. 270.

■ The Court is convinced that there was no racially discriminatory purpose or intent in the primary runoff enactments. Nor could those laws at that time have had any discriminatory racial effect since blacks could not run for office, vote, or otherwise participate in Democratic primaries. But plaintiffs go on to argue that such laws have been *maintained* for racially discriminatory purposes. After hearing all of the evidence, the Court is convinced that this is simply not so. The actual purpose was the stated purpose, to wit: to insure that no one was nominated as a candidate of the Democratic Party who had not received a majority of the votes cast. This is not a tenuous policy to conceal some racial animus but, rather, a "bedrock ingredient of democratic political philosophy." See discussion of Section 2 of the Civil Rights Act of 1965, *infra.*

Plaintiffs rely principally upon the circumstances surrounding the enactment in 1983 of Section 7–5–106, Ark.Stat. (1987) (which establishes the runoff requirement for candidates for municipal and county offices in *general* elections) as evidence of legislative intent to *maintain* the runoff requirement in *primary* elections for racially discriminatory reasons. They point out that this enactment followed directly upon the election of a black as mayor of West Memphis in a plurality election. Their reliance upon such evidence is misplaced for several reasons. First, that evidence falls far short of convincing the Court that the overall legislative intent for the enactment of Section 7–5–106 was tainted by racially discriminatory motives. Second, the "nature of the beast" is quite different in the two cases: section 7–7–202 applies to *party* conducted *primary* elections across the board, that is, in all cases where a political party chooses to nominate by the use of that vehicle instead of by party conventions; section 7–5–106 applies to *state-conducted general* elections for two specific type of offices only, i.e., municipal and local offices. Section 7–7–202 deals with one of the methods political parties may use to determine who their nominees will be in the general election. Section 7–5–106 deals with the manner in which persons are elected to certain municipal and local offices. Different motives and intents obviously may come into play in these two differing situations.[1] Third,

1. In the hierachy of the fundamental values of a democratic state, the manner in which political parties choose to identify their nominees for public office positions is not as important as the procedures used to control the actual election of such public officers. Using this reasoning, courts might feel less restraint in interfering with the nominating primary process than with the general election process. It is true that, in Arkansas, political parties are not required to use open primaries to determine their nominees. They may use the convention process.

So ruling that a primary runoff law was bad would not be as threatening to the basic democratic structure of government as would a like ruling with respect to a general election runoff law. (Indeed, under our republican form of government, the concept of plurality rule for general elections might itself be suspect constitionally.) But the significance is immense in either situation. And in one-party states, the primary elections may be the critical ones in determining who shall ultimately be elected.

plaintiffs fail to accept that the majority vote requirement in cases where primaries are used by political parties to nominate their candidates *is embodied in the Constitution of the State of Arkansas.*

Amendment 29 was adopted by vote of the people in 1938. That amendment, it should be recalled, was initiated by the people through petitions—*not* by the legislature. An effort to repeal it, Amendment 30 in 1940, *as proposed by the Arkansas legislature,* was resoundly defeated by the popular vote. So far as the Court is aware the issue has not been put to a popular vote since the defeat of Amendment 30. Therefore, the issue is beyond direct legislative reach. And the intent of the legislature is not in all cases the same as the intent of the people, as has been frequently demonstrated, and as was in fact demonstrated in this particular case when the legislature proposed Amendment 30 which, if enacted, would have abolished the runoff requirement in primary elections.

Indeed, it must be recalled that the repeal of the run-off statute in 1935 is what prompted the movement to embody the majority vote requirement in the Constitution where it would be *beyond legislative control.* And there is absolutely nothing in this record to suggest that the *voters* who caused the adoption of Amendment 29 and later rejected an amendment which would have repealed Amendment 29 had any racial animus in mind. The history is clear: race was not a factor. In fact, it has been suggested that fear of the power of the Ku Klux Klan may have been a motivating factor for some. But the perceived perversion of democratic principles (where plurality elections were permitted) was the overriding motivating factor.

Subsequent to the enactment of Amendment 29 and the failure of proposed Amendment 30 (to repeal Amendment 29), the people have had no further voting opportunity to reconsider the issue. So the majority vote runoff system in primary elections has been the settled practice in this state for over 50 years. The legislature, by its own actions, has no power to repeal Amendment 29. It cannot thus be contended that the *General Assembly* has *retained* or *maintained* the majority-vote

runoff requirement for discriminatory reasons. And, although the legislature has recently endorsed the runoff principle for use in connection with certain *general* election contests, its motive, as discussed above, was not, overall, tainted by racial considerations. The fact that a handful of legislators, in 1983 may have been motivated by such considerations is beside the point. We are to deal with the overall legislative intent.

It is interesting to compare the evidence pertaining to legislative intent in this case with that in *Butts v. City of New York,* 779 F.2d 141 (2d Cir.1985). There, the runoff proposal opponents argued in the legislature that the proposal would have the effect of preventing blacks and Hispanics from ever electing their own candidates. And it was argued that the 40% threshold was chosen because it was just above the combined population of blacks and Hispanics. On the basis of such evidence and arguments, U.S. District Judge Brieant concluded that the act was passed *for the purpose* of diminishing minority participation in the political process. The Court of Appeals held that Judge Brieant's finding of discriminatory intent was clearly erroneous. A portion of the Circuit Court's analysis and reasoning is pertinent here:

Judge Brieant placed particular emphasis on the remarks of two black Senators, Galiber and Stewart. Senator Galiber argued that the run-off bill would prevent a minority candidate from winning a city-wide election through a plurality and, consequently, from ever winning such an office. Senator Stewart opposed the law on the same grounds, arguing that the run-off was bound to degenerate into a race-based choice, and would thus extinguish the possibility of a black/Hispanic coalition candidate winning by plurality. He added that, in his view, the 40% threshold had been chosen because the black and Hispanic combined population then comprised 30% of New York City, and thus the higher figure shielded the offices from a minority coalition candidate.

We find more persuasive the contrary evidence in the record provided by the

remarks of the bill's proponents. First, responding to Senator Galiber, Senator Bloom stated that the purpose of the run-off was to bolster the weakening party system by ensuring that the candidate who emerged from the primary truly represented "the thinking of the majority." The court mistakenly characterized this statement as probative of racial motivation, interpreting the word "majority" to mean "racial majority." This is clearly not what Senator Bloom meant. His statements elsewhere in the debate clarify his view that the bill was not intended to and would not have the effect of weakening the voting power of racial—as opposed to ideological—minorities. Second, responding to Senator Stewart, Senator Brydges reiterated that the purpose of the bill was to ensure representation for the ideological majorities of political parties, and emphasized his opinion and hope that a minority candidate would one day profit from the run-off law.

The members of the Senate overwhelmingly passed the bill. The results in the Assembly—where the bill was virtually uncontested—were the same, with all 5 minority Assemblymen present voting in favor of the law. The district court, oddly, found this support *probative* of racial animus in light of the evidence before the legislature that the law would be costly and logistically difficult to implement. The district court made no mention of the support that the bill received from Senator Garcia (a Hispanic), and Garcia's statement during the debate that Badillo supported the bill, even though this evidence strongly undercuts the notion that § 6–162 was intended as an "anti-Badillo" measure. The court cited the "alacrity" with which the bill moved through the Assembly and Senate (two months), and Governor Rockefeller's quick approval, as somehow probative of the discriminatory intent behind the bill.

It is venerable principle that the legislature is presumed to act constitutionally. *See, e.g., Borden's Farm Prods. Co. v. Baldwin,* 293 U.S. 194, 209, 55 S.Ct. 187, 191, 79 L.Ed. 281 (1934); Thayer, *The*

*Origin and Scope of the American Doctrine of Constitutional Law,* 7 Harv.L. Rev. 129, 135–42 (1893). This rule was recently reaffirmed in *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), where the Court noted that courts should be "reluctant to attribute unconstitutional motives to the state, particularly where a plausible [constitutional] purpose may be discovered from the face of the statute." *Id.* at 394–95, 103 S.Ct. at 3066. Despite this, in analyzing § 6–162, the district court minimized evidence probative of the legitimacy of the law, and as a result drew all inferences against its constitutionality.

The events leading up to passage of the bill clearly support an inference of legitimate motive. The Proccacino nomination badly hurt the Democratic Party in New York City, and such fluke results were likely to recur as the party system further deteriorated and a broader field of candidates emerged. The application of § 6–162 solely to citywide offices in New York speaks primarily to the ideological diversity within the City and the importance of those offices. The 40% threshold, which Judge Brieant called "diabolic," was obviously chosen because Proccacino received 33% of the vote in 1969, not because of the minority population figures in New York. Finally, the speed with which the bill passed both houses demonstrates its broad-based support rather than any "nefarious" motives; this broad support is also evident from the strong minority legislative vote in favor of the bill.

At its core, the district court's holding seems to rest primarily on the statements in debate, of the bill's opponents. The Supreme Court has, however, repeatedly cautioned—in the analogous context of statutory construction—against placing too much emphasis on the contemporaneous views of a bill's opponents. *See, e.g., Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 204 n. 24, 96 S.Ct. 1375, 1386 n. 24, 47 L.Ed.2d 668 (1976); *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 394–95, 71 S.Ct. 745, 750–51, 95 L.Ed. 1035 (1951).

Rather, "[i]t is the sponsors that we look to when the meaning of the statutory words is in doubt." *Schwegmann Bros.,* 341 U.S. at 394–95, 71 S.Ct. at 750–51; *see N.L.R.B. v. Fruit & Vegetable Packers,* 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129 (1964). And, in fact, the legislative debates surrounding § 6–162 are filled with lengthy speeches by the law's proponents attesting to its legitimate ideological purpose; there is not a single remark by any proponent of the legislation that so much as hints at any improper purpose. We conclude that the speculations and accusations of the runoff law's few opponents simply do not support an inference of the kind of racial animus discussed in, for example, *Arlington Heights, supra,* 429 U.S. at 265–68, 97 S.Ct. at 563–65.

Accordingly, we hold that the finding of discriminatory intent in the passage of § 6–162 is clearly erroneous. New York City's run-off law does not violate the Equal Protection Clause.

So here the Court must start with the presumption that the legislature acts properly and constitutionally. And it should be reluctant to attribute unconstitutional motives to the state, "particularly where plausible [constitutional] purpose may be discovered from the face of the statute." And we are cautioned against placing too much emphasis upon the contemporaneous views of the bill's opponents. Rather, we should look to the statements of the sponsors if the meaning or intent is in doubt. Following such guidance here, we can only conclude that the plaintiffs' have completely failed in their attempt to show that the challenged primary runoff provisions were enacted or maintained for any racially discriminatory purpose.

The Court has already described the racial balance in the 75 Arkansas counties. Only 16 of those counties have black populations in excess of 30%. Statewide, the black population is 16%. One can see that in a great majority of the counties the thought or idea that a runoff mechanism might have racial significance or consequences would simply not occur to anyone. And likewise it would have no such significance to the legislators representing such counties.

The evidence in this case and the literature on the subject reveal that the absence of runoff requirements in the law has not generally come to the citizen's or legislator's attention until some bizarre result occurs in an election. Most often it has occurred when some candidate getting 30 to 40 percent of the vote has ended up "nominated" or "elected." See, e.g., the discussion of Mr. Henry Alexander's article, "The Double Primary," *supra.*[2] Whenever a person is elected by a plurality vote in this country, there appears to be a tendency for the citizenry, and their legislative representatives, to become agitated and concerned. This is understandable because Americans have traditionally been schooled in the notion of majority rule.[3] The theory is: a majority vote gives validation and credibility and invites acceptance; a plurality vote tends to lead to lack of acceptance and instability.

The concept of "majority-rule" dominates our national mind. But the problem is not confined to America. Many other democracies have had to deal with it. Recently, the French had a "run-off" election. The situation in South Korea appears to be that the present governing party did not get a majority of the votes in the most recent election. Their electoral rules are being challenged. Mr. Allende is said to have been the only Marxist who was ever elected the head of a democratic state. He received between 36 and 37 percent of the vote. A coup occurred. President Allende was murdered. Democracy has yet to return to Chile. Would a runoff requirement have preserved democracy there? One can only speculate. But the point is: there are com-

---

2. The Court views it as "sort of" like our attitude toward the Electoral College system. So long as the person elected usually or almost always has a majority of the popular vote, people do not get too agitated about that system.

3. The framers of our Constitution, while acknowledging this principle, also understood that a majority could run roughshod over a minority. The Bill of Rights was their answer to the prospect of the tyranny of the majority.

pelling, obvious reasons, completely un-related to race, for states to opt for runoff elections.

The plaintiffs, having failed to establish their constitutional challenges to the Arkansas primary runoff requirements, their claims in that regard will be dismissed.

## PLAINTIFFS' CLAIMS UNDER SECTION 2 OF THE VOTING RIGHTS ACT OF 1965.

■■■ Section 1973, U.S.C. 42 provides: (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973(b)(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

The quoted language reflects the 1982 amendment which Congress made to section 2 of the Voting Rights Act of 1965. By virtue of this amendment, Congress made it clear that plaintiffs need not show that the challenged voting practice or procedure was the product of purposeful discrimination. The Senate Report lists several "typical factors" that may serve to show a violation of the act. Those factors are:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; .

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularlized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

Senate Report at 28–29, U.S.Code Cong. & Admin.News 1982, pp. 177, 206, 207.

The most important U.S. Supreme Court case dealing with this issue is *Thornburg v. Gingles,* 478 U.S. 30, 34–37, 106 S.Ct. 2752, 2758–59, 92 L.Ed.2d 25, 37 (1986).

That case involved a challenge to the use of multimember state legislative districts. In the context of that issue the Court held that the most important of the Senate Report factors were the "extent to which members of the minority group had been elected to public office in the jurisdiction" and the "extent to which voting in the elections in the state or political subdivision is racially polarized." Whether those factors would be emphasized in dealing with a challenge to a runoff requirement is doubtful. But *Gingles* does make it clear that in challenges under section 1973 the court should conduct an intensely fact-specific appraisal. As stated in the plaintiffs' pretrial brief, "no court has yet developed a *Gingles*-like distillation for majority-vote cases." Plaintiffs' Pretrial Brief p. 5. Plaintiffs attempt to treat the runoff requirement as they would a "vote-dilution" case. And they maintain that all they need to show is that there is some causal relationship between the runoff requirement and the lack of "minority electoral success" and that voting in the challenged area is racially polarized. This Court does not agree. Plaintiffs must show a violation of Section 1973, i.e., that the runoff procedure was imposed or applied by the State of Arkansas in a manner which results in a denial or abridgement of the right of any citizen to vote on account of race or color. But the Court agrees that plaintiffs must show, among other things, some causal connection between the runoff requirement and the lack of "minority electoral success." Their evidence has failed to so convince the Court.

The premise of this whole attack is that blacks form a *minority* of the potential voters in Phillips County. The basic statistical data introduced into evidence may not support that assumption. Furthermore, at least since 1965, there have been no legal barriers to black participation in the political processes of the state. Nevertheless, the contention is made that because of the history of segregation and the socio-economic status of the blacks compared to whites in this area, it is, as a practical matter, more difficult for blacks to exercise their legal rights. More about that below.

The Court notes that in recent years there has been a much greater effort to register blacks. The county clerks in both Lee and Phillips Counties, for instance, have deputized many volunteers to assist in the registration efforts. The great bulk of these volunteers have been black and the great majority of those whom they have registered have been black. There is some evidence that the registration level of voting age blacks in some of the contested areas is equal to, or approaching, that of voting age whites. See statistics relating to Marianna in Lee County developed in the case of *Campbell v. Lee County Election Commission* and the census data in this record.

The Court finds that the black citizens of Phillips County do not still face harrassment or intimidation in registering, or in voting, or in running for office. The location of polling places is always a difficult problem. Blacks on the average, being poorer and having less access to transportation, may be said to experience more difficulty on a statistical basis in getting to the polls. Of course, poor whites face the same problem. The Court does not find that the location of the polls as described in the evidence constitutes a significant barrier to black or white participation given even minimal motivation to so participate. The evidence indicates that the black leadership in this area is highly organized and motivated during the elections and does attempt to, and does, provide transportation for those blacks supporting that group's objectives who request such assistance. See further discussion *infra*.

The laws relating to the assistance of persons at the polling booths have been liberalized. Although there has been some tightening up on the requirements for absentee voting, the objective has been to reduce the abuse of that mechanism which is in the interest of both blacks and whites who favor honest elections. As stated by Professor Stanley in "Runoff Primaries and Black Political Influences,"

Absentee ballot abuse can reduce the chances for ousting encumbents.

It has occurred to the Court that the principal problem is one of education and communication. We are not dealing here with an at-large voting system or racial gerrymandering. So, where the black voting age population and the white voting age population are approximately equal and there are no legally significant state-imposed barriers to full participation, the question arises on the front end whether there can be any legal predicate for an attack, such as this, upon a primary runoff mechanism.

Indeed, it occurs to the Court that, absent state-created barriers to registering and voting, there should be both some low threshold, as well as some high threshold of *minority* voting age population needed in order to trigger a consideration of any argument that a runoff device results in a denial or an abridgement of the right of any citizen to vote or to participate in the political processes of the state. It could readily be argued that where the minority voting age population was below, say, 20 percent or above, say, 45 percent, the issue would simply be foreclosed as a matter of law. Indeed, this argument was alluded to by the defendants, Governor Bill Clinton and Secretary of State Bill McCuen, in support of their motion for summary judgment in this case. Those then-defendants argued that the plaintiffs' attempt "to invalidate the majority vote requirement for all elections in the state of Arkansas is unnecessary and improper." P. 4, Brief in Support of Motion for Summary Judgment. They argued that the plaintiffs had presented no facts "which indicate that these requirements are discriminatory in state-wide, congressional, district or in county or local elections outside of Phillips County." They were, in effect, contending for a "low threshold" requirement. The Governor and Secretary of State argue:

> Many countries and municipalities in Arkansas are all or virtually all white. It is definitionally impossible to have any intent to discriminate against blacks in an election in an all white county or municipality. Likewise, with regard to state elections, it is definitionally impossible to assume a discriminatory intent or effect when only sixteen percent of the population, according to census statistics, is black. Even in a worse case scenario, under which there is absolute rigid and total racial block voting in State elections, eliminating the majority vote requirement would have no effect in helping blacks elect candidates of their choice because their portion of the population is simply too small.

And, as indicated above, when the voting age population of blacks approaches equality with the voting age population of whites and the evidence shows, in addition, a consistent pattern of "crossover" votes in actual elections, which, although small percentagewise, are sufficient to "bridge the gap," the basic assumption used to challenge runoff provisions appears to be undermined. In this connection, the Court notes the language of the Court of Appeals in *Perkins v. City of West Helena*, 675 F.2d 201 (8th Cir.1982), cited to this Court in plaintiffs' pretrial brief:

> [R]acial block voting prevails in West Helena. Almost without exception, black candidates have received more than 90% of the vote in the identifiable "black voting areas" and only 15 and 24 percent of the vote in "white voting areas."

p. 213. The evidence in this case likewise shows a consistent minimum "cross-over" vote. It is the Court's view that we do not have here the minimal disparities necessary to establish either whites or blacks as a "minority" of the voting age population. Those populations are for practical purposes equal.

Beyond the question of whether blacks in the instant case constitute a cohesive "minority" of the size necessary to trigger an inquiry into the question whether the primary runoff law might discriminate against blacks, there is the further question of whether this particular election device, e.g., the primary runoff here, has a consistent effect of discriminating against the black minority. For the purpose of this discussion we might assume that the political unit involved has a voting age population of 60 percent white and 40 percent black.

Professor Harold W. Stanley has written persuasively on this issue. He cites the arguments made by the plaintiffs here:

Without the runoff's majority vote requirement, black candidates in minority black districts could gain the Democratic nomination—drawing on solid black voting support, while two or more white candidates split the white vote. This would produce more black nominees, which would mean more black elected officials, because these black Democratic nominees should enjoy—thanks to the party label—sufficient general election support from Democratic whites for victory. When a sufficient share of whites back black candidates, these candidates can garner a majority of the vote for the nomination and the election. Critics contend that, when whites do not prove sufficiently willing to back black candidates, the runoff's majority vote requirement works against the nomination and—thus —the election of blacks.

Professor Stanley then proceeds to address the logic and the practicality of the claims that runoffs disadvantage blacks. He states:

[W]hether runoffs are racially discriminatory has yet to be determined. Firm evidence to address critical questions is lacking....

Nevertheless, he concludes that the available evidence casts doubt on such claims. After citing the election of Doug Wilder as Virginia's Lt. Governor and the elections of Harold Washington as Mayor of Chicago, he observes:

The levels of support that they secured in the general election—even if somewhat reduced—would have allowed them to succeed in a primary runoff.

He then makes the following analysis:

For the South in general, if we assume that a plurality-win primary system would mean more blacks as Democratic nominees, we could not confidently anticipate the election of more black officials. The appeal of Republicans to white southerners, the reluctance of some southern whites to vote for black candidates, and the relative size of the black vote combine to check such predictions. Gone are the days of the solid South:

The Democratic nomination is no longer tantamount to election. Even for electoral contests between white candidates, Democratic whites voting for Republicans have characterized the recent South. Where electoral politics is racially charged, the added stimulus of race could make such defections even more common. In majority nonblack areas, a black Democratic nominee can count on facing a white Republican candidate in the general election; indeed, the prospect of a black Democratic nominee gives additional encouragement to Republican candidacies. The lack of white support that makes it difficult for a black to gain a majority in a Democratic runoff in a majority nonblack district would work to favor Republican prospects—resulting in the defeat of the black candidate. Making southern whites choose between race and party when their party ties have considerably loosened might accelerate the decline of the Democrats—and promote Republican prospects to an extent that Republicans themselves have not yet managed. More generally, the nomination of splinter candidates could make the Republican alternative more attractive in the eyes of many. "No question," U.S. Representative Wyche Fowler (D–Ga.) said, "the best thing that could happen to the Republicans is the abolition of the runoff primary. It would build the Republican party overnight."

Southern blacks are the most loyal Democratic group, but they are too few to ensure victories in most southern electoral constituencies. An exact count of the black population for each southern election district is not available; but the political import of the black population can be gleaned from the distribution of southern blacks in states, congressional districts, counties, and cities (Table 14.1). Most southern blacks live in electoral districts less than 30 percent black. The prospects for general election majorities based primarily on black votes are restricted to very few southern districts. The distribution of the southern black population indicates that the election of black or black-backed candidates in most

of the South hinges on biracial coalition politics.

Having concluded that the elimination of the runoff requirement would not likely produce more black elected officials, he asked whether its removal would produce more nominees. His answer is as follows:

The likelihood of black nominees gaining a plurality of the primary vote in a crowded field seems enticing enough to encourage some to argue for ending the runoff. However, in majority black districts—as supporters of the runoff point out—the lack of a runoff might cause several black candidates to split the black vote and allow a white candidate to gain a plurality nomination. Thus, the runoff can protect and promote black political prospects in majority black districts. For this reason, voting rights litigators who are working to dismantle at-large election systems and replace them with single-member districts (some districts being majority black) find the emphasis on ending the runoff to be misplaced. Recent reapportionments have reduced the number of multimember districts—making more districts majority black. After reapportionment produced an increase in single-member districts (several with black majorities) the chairman of South Carolina's House black caucus noted. "Things have changed so that the runoff now can work in our favor."

His logic is supported by the evidence in this case. The blacks have a voting age population majority in some of the Justice of the Peace districts in Phillips County. If two or more blacks chose to run in the primary and only one white, then the same possibility, i.e., of a minority white plurality nominee, would occur.

The Court shares the doubts of others that runoff requirements have any identifiable racially discriminatory effects. It is one thing for the plaintiffs, Mr. and Mrs. Whitfield, to point out that, after their first primary elections, they would have been the Democratic Party's candidates in the general election if they had not had to face a runoff; it is quite another thing to state that, had there been no runoff provisions when they ran in the primary, they would

have been the Democratic candidates for the particular offices they were seeking. Once you change the rules, then a different dynamic obtains which has been described by Mr. Stanley in his article, "Runoff Primaries and Black Political Influence," which is discussed above.

It goes without saying that runoffs are of no importance if only two candidates are in the race. Putting aside the remote possibility of a tie vote, in that situation, the winner must gain majority support. So a plurality election system, where racial voting and racial polarization exist, will result in attempts to limit the number of candidates on one's own side and, at the same time, to attempt to increase the number of candidates on the opposition side.

How thin a reed are plaintiffs relying on! Rationality is not involved. Only happenstance. The idea is: Maybe the black community can agree on one candidate and somehow prevent other black candidates from filing while the white community does not respond in kind and therefore ends up with two or more white candidates in the race. This is not a political theory or philosophy; it is gamesmanship, political Russian roulette; and it is based solely on race. Note Professor Stanley's comments on the studies of Bradley Canon,

Ending the runoff accomplishes little, if political forces then tend to restrict contests to two candidates. Experience with single primary and runoff systems in the South and the Border South indicates that runoffs encourage multiple candidacies in the first primary, but that single primary systems work to limit the number of candidacies to two. This difference has political, rather than racial, roots—although racial considerations can reinforce the tendencies. Bradley Canon examined gubernatorial primaries, runoffs, and nominations in 16 southern and border-south states between 1932 and 1977: He found that, in the 10 states with runoffs, the top two candidates averaged 67 percent of the first primary vote; but that, in 6 states with single primaries, the top two candidates averaged 93 percent of the vote. In a runoff system, several candidates can enter the

first primary and strive to qualify for the runoff; should they fail in that quest, they can productively bargain with the first- or second-place finisher to deliver support in the runoff. Under a single primary system, such bargaining takes place before the primary, as interested parties seek to line up behind a winner. The single primary system's tendency to limit contests to two serious candidates—in conjunction with the pressures provided by racial polarization—make it likely that a black candidate for the nomination would face a single white candidate. This matchup would produce defeat for the black candidate in election districts that are not winnable by a black in a runoff.

There is nothing in the evidence which supports the contention that the plaintiffs here would have been the nominees of the Democratic Party in the general election had they run in a single, plurality-win primary. Had there been a single primary, plurality-win law in effect, and this was known to all before the fact, one can only speculate as to what would have happened.

In addressing the prospects for black candidates, Professor Stanley observes:

The willingness of some Democratic white voters to back Republican candidates and the reluctance of some to vote for black candidates would turn the elimination of the runoff into a recipe for reducing black political influence. Those pushing for abolition of the runoff assume that such white voters are unfit to shape the future of the Democratic Party. Yet, insofar as political parties are organizations held together by a desire to win elections (rather than mount losing crusades) current voter attitudes need to be worked with—not assumed away. Southern black voters are loyal Democrats, however, basing the party on such a loyal but limited constituency does not promise success at the polls. Few southern Democratic elected officials have gained office without a sizable share of white votes; most Republican officeholders have gained office with very few black votes. Outside majority black districts, black votes as the only source of support are seldom sufficient for election, but without black votes some Democrats would have lost. (Not even Jimmy Carter, when he was elected president over Ford, gained a majority of the popular vote among white southerners.)

For Democratic candidates, nomination rules that encourage the seeking of biracial support promote prospects for election. Retaining the runoff can lead to more black-white coalitions that back Democratic candidates who make successful biracial appeals. Courting and composing such biracial coalitions require a politics that is capable of reducing racial polarization, rather than reinforcing it. Such political cooperation between the races provides a more promising basis for collaboration on the eventual nomination and election of southern black candidates. On the other hand, eliminating the runoff where strong racial polarization exists—even if this would produce more black nominees (which seems unlikely)—should mean continued racial polarization, lower Democratic chances of succeeding in the general election; and an acceleration of the movement of southern whites into the Republican party, as white voters and politically ambitious whites find the GOP an increasingly attractive alternative.

It is clear to the Court that a runoff requirement encourages candidates to seek biracial support. The runoff requirement almost mandates consensus-seeking collaboration between whites and blacks within the Democratic Party. The elimination of the runoff requirement would not, in the opinion of the Court, reduce racial polarization, but would tend to reinforce that polarization. Issues and qualifications would tend to take a back seat to race. And, once a "no runoff" rule was established, the game of foreclosing legitimate opposition in the interest of racial solidarity would thrive alongside of the stalking horse phenomenon.

Professor Stanley analyzes recent southern gubernatorial elections to measure electoral responsiveness to the interests of blacks. He concludes that such responsiveness best characterizes the "post-Voting

Rights Act South." He analyzes the elections between 1954 and 1965 on the one hand and those between 1966 and 1973 on the other. The data indicates that the responsiveness to black interests increased dramatically in the later period, essentially reversing the earlier tendency. He notes that the success of certain strong segregationists did not mark the path by which later gubernatorial candidates would succeed.

The strong segregationist victor in Arkansas in 1966 lost to a racially progressive Rockefeller in the general election. The next victorious Democratic governor and his successors reflected the progressive Rockefeller.

Professor Stanley compared the gains made by blacks in southern states without the runoff and those with the runoffs:

In southern states *without* the runoff during this period—Virginia since 1970, and Tennessee—gains in the number of black elected officials and the increased black political influence generally did not surpass the gains recorded by states with runoffs. Such a comparison suggests that, in recent years, the runoff has not diluted the strength of the black vote. (emphasis added)

In his conclusion, Professor Stanley again asks if the runoff is "racially discriminatory." And he concludes "that the runoff is not racially discriminatory." He observes that:

Abolishing the runoff now would ultimately result in few (if any) additional black Democratic nominees, few (if any) additional black elected officials—and more Republican victories. Such an outcome would serve to exclude black voters from more winning coalitions—thereby reducing black political influence.

He even observes that in recent years the evidence suggests that the runoff "has promoted black influences:"

Maintaining and maximizing black political influence requires removing the remaining racially discriminatory barriers that blacks face. As reports have noted, some southern blacks still face harassment and intimidation in registering, voting, and running for office; uncooperative or even hostile registration and poll-

ing officials depress the black vote; black access to the polls is made more difficult by the location of polling places and the lack of effective assistance at the polls; restrictive registration practices also affect whites, but—given the legacy of past educational and economic discrimination—such practices have a greater impact on blacks, limited access for black candidates to the white community—particularly, civic organizations and sources of campaign funds—can reduce chances of election; absentee ballot abuse can reduce the chances for ousting incumbents; and racial gerrymandering can carve bleak constituencies for black electoral prospects. The runoff does not deserve inclusion among lists of the barriers that deny blacks an equal opportunity to participate in the political process and to elect representatives of their choice. Consequently, drawing attention to the runoff diverts attention from the real problems.

Without adopting the rationale in the *Butts* case (i.e., that section 2 does not apply to majority vote requirements when the election at issue is for a single office), the Court nevertheless does have serious doubts whether the run-off provision (at issue here), in the factual context revealed by the evidence, could, as a matter of law, be deemed to be a device capable of making the political processes leading to nomination less open to participation by blacks than to others or capable of resulting in blacks having less opportunity than others to participate in the political process and to elect representatives of their choice. In Phillips County, the black population constitutes approximately 53 percent of the total, and the voting age population of blacks is only marginally less than that of the whites. In Lee County, the situation is similar but blacks appear to be marginally a majority of the voting age population of that county. Although there is evidence of extreme racial polarization in voting in recent years, there is almost invariably a minimal "cross-over" of blacks for white candidates and whites for black candidates. We have a situation, therefore, in which one cannot readily speak of the blacks or

the whites as being the "minority" or the "majority."

The case, *Campbell, et al. v. Lee County Election Committee,* (No. H–C–86–48), which is still before the Court, involved a plan of reapportionment to produce equal single member districts. The black plaintiffs argued that they would need a voting age population of 60 percent or more in order to have a "safe" black district and any real opportunity of electing the representatives of their choice. In the absence of demonstrated barriers to full political participation by blacks in the electoral process, the court characterized such an argument as a racial slur against blacks. The Court discussed that view with counsel in this case.

Because of the circumstance that the voting age populations of blacks and whites in Phillips County is equal for practical purposes, the Court assumes that the petitioners are contending that, even where black voting populations equal or exceed white voting populations, blacks should nevertheless be considered a "minority" because of the evidence that they have not participated in the past in the political processes of the county in as large a proportion as have whites. Again, the Court rejects such a view, believing it to be both unwarranted, contrary to law, and counterproductive.

We have placed our faith in the "one person, one vote" rule. At great danger do we suggest that the votes of one group should be weighed heavier than the votes of another group. Even where a lower socio-economic status can be traced to a history of racial discrimination, i.e., where blacks in a particular area are not as well-educated or as well-off economically as whites, because of a history of discrimination, as here, courts would do well to go slow and to resist the temptation to make up for such past wrongs by tampering with the fundamental principles of our electoral system. At least this Court will refuse to do so, and it will rule, as a matter of law, that the undisputed population figures here are not such as will permit the plaintiffs to challenge the primary runoff law of the state of Arkansas as a violation of Section 2 of the 1965 Voting Rights Act, as amended.

■ Even assuming that the population figures were such as would permit the plaintiffs here to challenge the primary runoff law, they have not proved or demonstrated by the evidence that such a provision, based on the totality of the circumstances revealed by the evidence in this case, has had, or has, the effect of discriminating against blacks or that there is any causal connection between the lack of black electoral success and the challenged runoff procedure.

## THE ROLE OF THE SENATE REPORT TYPICAL FACTORS.

One must understand the function and importance of the Senate's factors. The factual determination which the Court is called upon to make under section 1973(a) is whether the challenged practice is being applied by the state or political subdivision "in a manner which results in a denial or abridgement of the right of any citizen to vote on account of race or color ... as provided in subsection (b)." Subsection (b) states that a violation of subsection (a) is established "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election ... are not equally open to participation by members of a class of citizens protected by subsection a ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." Subsection (a) therefore sets forth the general operative factual issue and subsection (b) a particular showing that will establish a violation of subsection (a). The Senate Report then brings the Court's attention to certain "typical factors" that *may* serve to show a violation of the Act.

■ It should be noted that subsection (b) does not invade the judicial fact finding function by compelling a violation-conclusion with respect to subsection (a) upon the basis of a "showing" that does not logically support such a conclusion. If subsection (a) had not included the words "or abridgement," the situation might be otherwise because a showing that, because of the

challenged procedure, blacks have" less opportunity to participate in the political process" and "to elect representatives of their choice" might not rationally and logically support the conclusion that the challenged practice or procedure is being applied by the political subdivision "in a manner *that results in a denial ... of the right of any citizen to vote* on account of race or color." (Emphasis supplied). But, if made, the showing specified in subsection (b), and the natural inferences arising from such showing, can be said to rationally and logically support the conclusion that the challenged procedure results in an "abridgement" of the right of any citizen to vote on account of race or color. By contrast, it cannot be said that a positive finding with respect to some, or all, of the "typical factors" referred to in the Senate Report would automatically require the conclusion that subsection (a) had been violated. The "typical factor" findings, and the inferences arising therefrom, simply may not logically and rationally tell us anything about the effect of the challenged procedure. The Senate Report factors more logically support proof relating to "intent" issues than "cause and effects" issues.

Nevertheless, although Congress may not intrude upon the judicial fact finding functions, it may properly suggest that the Court consider certain factors before reaching its decision. But no particular number of "positive" findings with respect to such "typical factors" can dictate the ultimate factual finding required under section 1973(a). So the Senate Report "typical factors" do not have the same function as the finding identified in subsection (b). Subsection (b) states that a violation of subsection (a) *"is established if ... it is shown ... etc."* (Emphasis supplied) So if the showing described in subsection (b) is made, that, in itself, will "establish" a violation of subsection (b). By contrast, a positive finding with respect to the various "typical factors" listed in the Senate Report will not automatically control the ultimate factual findings.

During the oral argument of this case, the Court observed that the evidentiary record made by the plaintiffs here in their attack upon the primary runoff statute would have been practically the same if the plaintiffs had been attacking a "plurality-win" provision of state law, i.e., if they were asking the Court to mandate a runoff requirement. In other words, let us assume that the controversy arose as a result of the outcome of a primary election in those J.P. districts in Phillips County in which blacks constitute a large majority of the voting age population. Let us assume that one white ran against two blacks and received 40 percent of the vote, whereas each of the blacks received 30 percent of the vote. The argument could then be made that the plurality-win practice or procedure discriminated against blacks because it permitted a white to win without obtaining a majority of all of the votes cast. But the evidence presented would be practically the same as that presented in this challenge to the runoff procedure, at least with respect to the Senate Report "typical factors." The evidence would be the same with respect to the history of official discrimination; the extent to which voting is racially polarized; the extent to which blacks presently bear the effects of discrimination in such areas as education, employment and health which hindered their ability to participate effectively in the political process; the extent in which blacks have been elected to public office, etc.

Or let us assume that the attack is upon the use of popular elections for the selection of party nominees. Under the Arkansas Constitution, party nominees may be chosen by party conventions. So what if the procedure being attacked was the use of elections? Again, the proof would be essentially the same as it was in this case as far as the Senate factors are concerned. And the same arguments could be advanced against the use of elections as plaintiffs have used here in attacking the runoffs procedure.

But the Senate factors have never been considered a "magic bullet" which can put in jeopardy any electoral procedure, including elections themselves. No, the Court must still deal with the ultimate factual issues identified in subsections 1973(a) and (b).

With these thoughts in mind, let us go through, one by one, the "typical factors" listed in the Senate Report in the light of the evidence presented in this case. The first is:

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.

Arkansas, as well as all other southern states (and probably all northern states), has a long history of racial discrimination. That discrimination touched the right of blacks to register, to vote, or otherwise to participate in the democratic process. So factor #1 is practically a "given," at least with respect to any southern state or any political subdivision of any southern state. The only question would be: when did this "official discrimination" end in the voting rights area?

2. The extent to which voting in the elections of the state or political subdivision is racially polarized.

The Court finds that there has been extreme racial polarization in voting in Phillips County, Arkansas, in recent years. Indeed, depending on how one interprets "racial polarization," and relying on judicial notice, there appears to have been "racial polarization" in each of the primary elections in which the Reverend Jesse Jackson has run in this nation so far during this spring. Without exception, 90 percent plus of the blacks participating have supported his candidacy and the great majority of whites have supported white candidates.

Dr. Richard Engstrom testified concerning this subject. He analyzed each county-wide race in Phillips County in which both black and white candidates competed since the year 1984. He used two methods: (1) the "extreme case" (or homogeneous precinct) analysis and (2) bivariate ecological regression. He found that black voters have overwhelmingly supported black candidates while white voters have overwhelmingly voted for white candidates. In 10 of the 14 contests, he found that over 80 percent of the black voters voted for the black candidate. And in all 14, a clear majority of black voters preferred the

black candidate. Conversely, in 8 of the 10 contests, he was able to analyze for "white precincts," less than 10 percent of the white voters voted for the black candidates and in the other two, less than 15 percent of the white voters voted for black candidates. These figures were derived from using the "extreme case" procedure. Using the weighted double racial regressions, Dr. Engstrom found polarization to be even more striking. It was his opinion that in 11 of the 15 contests, over 90 percent of black voters preferred the black candidate and in the other 4, an overwhelming majority of black voters are estimated to have preferred the black candidate. At the same time, in 11 of the 15 contests, the regressions estimated that not a single white voter voted for the black candidate. In the other 4, whites' support was estimated at less than 10 percent.

The Court relies more heavily on the raw figures introduced into evidence. Based on all the evidence, the Court finds strong polarization in line with the factual statements made in the Court's opinion stated above. That is, despite the polarization, there was consistently a "cross-over" vote on each side sufficient to create the possibility of uncertainty in the outcome. So, on the basis of judicial notice and the evidence actually introduced, the plaintiffs have satisfied the Court that there is severe racial polarization in the elections in Phillips County.

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority.

It is interesting to note that the U.S. Senate apparently has suggested that "majority" voting is a procedure that "may enhance the opportunity for discrimination." That is far from clear to the Court based upon the evidence and authorities it has reviewed. Nevertheless, yes, the state has imposed upon Phillips County the "majority vote requirement" in primary elections. The Court does not find that the county

has, in the recent past, used any of the other "discrimination-enhancing" voting practices mentioned.

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process.

There was no evidence upon this point.

5. The extent to which members of the minority group in the state or political subdivision. bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.

This is also a "given" for the state of Arkansas and Phillips County and probably for every other political subdivision in the nation. But the effects are more devastating in Phillips County than in other places because of the dire economic circumstances that have developed in that area of the state over the past decade. Although the Court is finding that blacks still bear the effects of discrimination in such areas as education, employment, and health, nevertheless, the Court also finds that those effects should not hinder their ability to participate effectively and equally in the political process. The Court also notes that typical factor # 5 refers to the "ability to participate" rather than "opportunity" to participate as stated in the statute. The statutory language, not being ambiguous, controls. The effects of discrimination referred to do not, in any legally significant way, hinder the "opportunity" or, indeed, the ability of blacks to participate effectively in the political process.

Because there are no legal barriers remaining to the opportunity of blacks to participate in the electoral process, plaintiffs have naturally emphasized the "socioeconomic" factors. Considering the nature of our nation's political and economic system, one must move with care in this area.

There are certain truisms about the participation of Americans in elections. It is said that the young, the poor, and the uneducated do not participate in the same proportions as the older citizens, the rich, or the well educated. These considerations are, by definition, race neutral. Although it may be that poor blacks, say, do not participate to the same degree as equally poor whites, the record is silent on this point.

Viewing from a larger perspective, the participation of qualified American citizens in elections is abysmally and disgracefully low compared with that of almost any other democratic nation on the face of the earth. So, regardless of age, regardless of economic status, regardless of education, regardless of health, our performance, as rated, for instance, by the percentage of those who actually vote in presidential elections, is very poor. The other side of that coin is that we as a nation have not chosen to require or coerce participation or to penalize non-participation. Indeed, it is not clear that Congress has the power under our Constitution to mandate participation. In any event, it has not chosen to attempt to compel participation or to penalize non-participation.

Some argue that American citizens "vote" when they choose not to vote—that the failure to go to the polls is a rational expression of political choice. Although that might be true in a small number of cases, the Court suspects that the lack of education, awareness, and interest—or a feeling of estrangement, frustration, futility or ennui—are the more likely bases for non-participation.

The point is that there must be some minimum motivation, some personal goal, before a citizen will take the trouble to register, to learn about the issues and candidates at hand, and to vote.

Plaintiffs have emphasized the disparity between the percentage of blacks as compared to whites who have telephones or automobiles. They point to data showing that in the Phillips County area, 30 percent of black homes have no telephone and 42 percent of black households have no automobile. And they can demonstrate that not having a telephone or an automobile makes it more difficult and less convenient for a citizen to qualify for, and to exercise, his or her voting rights. The tricky words are "difficult" and "inconvenient." So far, the state has left it to the political parties, their adherents, and those seeking nomina-

tion in partisan primary elections to motivate, to communicate with, and to assist those whom they wish to participate in such elections. The state, or political subdivision involved, has no role in this regard. And neither the Constitution nor the Voting Rights Act requires political parties to contact prospective individual voters, urge their participation, or provide transportation for those potential voters. But the law does require the absence of legal barriers. It also requires that no procedure operate to deprive any citizen of the right to vote, or to deny to any citizen the equal opportunity to participate in the political processes of the community. But ordinary inconveniences such as one might experience if he wished to go to the doctor's office or to the post office or the general store should not be deemed to constitute legal barriers simply because the objective is to get to the voting place. The value one places on one's right to vote will be reflected in the difficulties and inconveniences overcome in exercising that right.

One of the few physical barriers which the plaintiffs emphasized in this case was the location of the polling places. The plaintiffs have suggested that many of the voting precincts could be located in places more convenient to the black voters. The use of black churches was suggested. There was no persuasive evidence that the polling places in 1987 in Phillips County were established to discourage voting by blacks. Mostly they appear to be established by inertia—the choices in one election being followed in the next. The low level of participation cannot be traced to this circumstance. This is not to say that improvement could not be made in this regard.

But let us assume for a moment that the location of the polling places in the primary elections in Phillips County did have the effect of making it more difficult for blacks than whites to participate in the political processes. What does that tell us about the effect of runoff elections? Nothing. If the culprit is the practice or manner of locating polling places, should not that, then, be the practice that is attacked?

6. Whether political campaigns have been characterized by overt or subtle racial appeals.

In their Pre–Trial Brief, plaintiffs state: "While recent campaigns in Phillips County have not been characterized by overt racial appeals, plaintiffs will present evidence of the central role race plays in Phillips County politics." The Court does not find evidence of significant, overt or subtle racial appeals, but accepts that those participating in the electoral process in Phillips County in recent years have more or less come to accept race as playing a central role in that county's politics. This is not to assess responsibility for that unhealthy situation, but race has frequently dominated over qualifications and issues. It is the Court's belief and hope that this is a transient phenomenon on the road to a more rational approach to political participation.

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

No black candidate has been elected to any county-wide office or to any state legislative office from Phillips County. One black candidate has been elected to office from a predominantly white jurisdiction in a head-to-head race. Within the county, blacks have won several Justice of the Peace elections (a county legislative office) in single member district contests.

The Senate Report, in addition to the seven typical factors, mentions two additional factors, to wit:

Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

There was not much evidence pertaining to the responsiveness on the part of elected officials "to the particularized needs" of blacks. The Court has already noted the comments of Mr. Stanley on the great increase in such responsiveness in recent

years based upon his study of southern gubernatorial contests.

Finally we come to whether the policy underlying the state's use of the runoff requirement is "tenuous."

The plaintiffs point out that only ten states have majority-vote requirements and most of them are in the south. Although plaintiffs acknowledge, as they must, the history of the primary runoff requirement, they state that Arkansas did not seek to impose a majority-vote requirement in general elections until 1969, "during a period of growing black activity." Their claim is that this first attempt, and subsequent attempts which culminated in 1983 with the passage of section 7–5–106, were in part "responses to the perception that a plurality-win system allowed black voters to exercise significant influence in the political process at the state level and provided them with a realistic opportunity to elect black candidates at the local level." See plaintiff's Pretrial Brief, p. 14. As pointed out in the discussion above, the plaintiffs' evidence simply does not establish that which is asserted in the brief.

We are dealing here with the very heart of our political system.

What are the policies underlying the primary run-off laws and Amendment 29 to the Arkansas Constitution? It must be assumed that the Democrats who overwhelmingly controlled the state General Assembly (our legislature) in the past, and still do today, believe their party should adhere to certain principles. Majority-rule is one of those principles. And that principle has had overwhelming, popular support when it has been on the ballot in Arkansas. But equally important are the reasons stated by Professor Stanley which we repeat here:

For Democratic candidates, nomination rules that encourage the seeking of biracial support promote prospects for election. Retaining the runoff can lead to more black-white coalitions that back Democratic candidates who make successful biracial appeals. Courting and composing such biracial coalitions require a politics that is capable of reducing racial polarization, rather than reinforcing it. Such political cooperation between the races provides a more promising basis for collaboration on the eventual nomination and election of southern black candidates. On the other hand, eliminating the runoff where strong racial polarization exists—even if this would produce more black nominees (which seems unlikely)—should mean continued racial polarization, lower Democratic chances of succeeding in the general election; and an acceleration of the movement of southern whites into the Republican party, as white voters and politically ambitious whites find the GOP an increasingly attractive alternative.

Each party has an objective of breaking down harmful divisions among its supporters. The evidence suggests that plurality-win statutes or rules promote racial polarization and separation. Run-off provisions promote communication and collaboration among the various constituencies by which coalitions are built.

Everyone involved in this lawsuit agrees that racial polarization in voting, i.e., voting for someone simply because of his or her race, is bad. Everyone agrees that we look forward to the day when the qualifications of the candidates, their principles, programs and policies and their positions on the issues will dominate political debate.

The Court looks on the current malaise in Phillips County as a temporary phenomenon that will, over a relative short time, pass. The Court is convinced that the elimination of the run-off would tend to perpetuate racial polarization and bloc-voting. The existence of the run-off provision has the opposite tendency. The state and party policy behind the primary run-off laws is, therefore not tenuous but, to the contrary, strong, laudable, reasonable and fair to all.

Having reviewed the Senate Report factors and some of the proof relating thereto, the Court must determine whether its positive findings with respect to many of those factors make it more probably true than not true that the challenged run-off provision makes the political processes not "equally open to participation" by blacks in that blacks have "less opportunity

than whites to participate in the political process and to elect representatives of their choice."

It should be apparent by now that most of the positive findings with respect to the Senate Report factors have no tendency to prove, or disprove, that proposition. The truth is that focusing on some of those factors serves more as a distraction than a useful tool for evaluating the cause and effect operation of the challenged runoff laws.

## CONCLUSIONS

This Court is not denying plaintiffs relief because it hopes and believes that the normal democratic processes of give and take will, over time, move Phillips County and the other Delta counties beyond "race politics," although that, indeed, is its hope and belief. It is denying plaintiffs relief because they have failed to establish either their constitutional claim or their statutory claim. They have failed to prove that the primary runoff laws of the state of Arkansas were enacted or maintained for any racially discriminatory purpose, and they have failed to convince the Court that Section 2 applies to such runoff provisions given the demographics of the area and the manner in which runoffs operate. And, finally, assuming Section 2 would apply to runoffs in such circumstances, the proof does not sustain plaintiffs' contention that the challenged provisions result in plaintiffs' and other blacks' having less opportunity than white citizens to participate in the political process or to elect candidates of their choice. Their complaint will, therefore, be dismissed.