### John MONROE, et al., Plaintiffs-Appellants,

v.

### CITY OF WOODVILLE, MISSISSIPPI, et al., Defendants-Appellees.

### No. 86–4414.

United States Court of Appeals, Fifth Circuit.

June 5, 1987.

Rehearing and Rehearing En Banc Denied Aug. 24, 1987.

Willie L. Rose, McComb, Miss., Deborah A. McDonald, Natchez, Miss., Southwest Mississippi Legal Services, McComb, Miss., for plaintiffs-appellants.

**508**

Dennis L. Horn, Jackson, Miss., Richard T. Watson, Woodville, Miss., for defendants-appellees.

Before REAVLEY and RANDALL, Circuit Judges, and WOODWARD,* District Judge.

PER CURIAM:

Plaintiffs appeal the district court's grant of summary judgment against and dismissal of their claim that their voting rights are violated by the defendant city's electoral system, which allegedly dilutes the voting strength of blacks, 636 F.Supp. 423. We reverse the judgment entered by the district court and remand for further proceedings.

I.

According to the 1980 national census, the defendant City of Woodville, Mississippi ("the city") has a population of 1,512 residents. Of the city's voting-age population of age 18 or older, 632 residents are black (60.5%) and 412 residents are white (39.5%). Despite the numerical superiority of voting-age blacks in Woodville, black candidates have been noticeably unsuccessful in their attempts to win municipal office. Since 1969, sixteen black candidates have run for positions on the city's four-member board of aldermen. Yet a black candidate has won a position on the board of aldermen only twice, although at least two black candidates have run for alderman in each municipal election since the enactment of the Voting Rights Act in 1965. This sole black alderman was elected in 1981 and reelected in 1985. The lack of success of black candidates in winning aldermanic elections is reflected in the electoral results of races for other municipal offices.

The city's aldermen, like other elected city officials, are elected on an at-large basis. At all times relevant to this appeal, the Mississippi Code proscribed single-shot voting; that is, if an elector voted for less candidates than the number of positions in that office to be filled by the at-large election, his ballot would be void under Mississippi law as to any candidate for whom he voted. *See* 1950 Miss. Laws ch. 491, § 66 (formerly codified at Miss. Code Ann. § 21–11–15 (1972)), *repealed by* 1986 Miss. Laws ch. 495, § 329; *see also City of Rome v. United States,* 446 U.S. 156, 184 n. 19, 100 S.Ct. 1548, 1565 n. 19, 64 L.Ed.2d 119 (1980) (explaining the potentially dilutory effects of an anti-single-shot provision upon minority voting strength in an at-large electoral system).

Early in May of 1985, the plaintiffs, four blacks registered to vote in Woodville, filed a complaint seeking to certify a class of similarly situated individuals and demanding injunctive relief against the city under section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, the thirteenth, fourteenth, and fifteenth amendments to the United States Constitution, and 42 U.S.C. §§ 1981, 1983 & 1985. Plaintiffs alleged that the city's at-large electoral system diluted black voting strength and thereby violated their rights under the above-mentioned constitutional amendments, and also violated section 2 of the Voting Rights Act. Plaintiffs asked the district court to divide the city's at-large electoral system into single-member electoral districts, in order to avoid the dilutory effects of the at-large electoral system.

After almost a year of discovery, the city filed a motion for summary judgment. In its motion, the city took the peculiar stance of conceding liability on the merits for the purposes of that motion, but argued nonetheless that the plaintiffs were not entitled to a remedy: because blacks already constitute a 60.5 percent majority of the voting age population of Woodville, they "accordingly currently possess any remedy they might receive pursuant to ... Section 2 of the Voting Rights Act." *Monroe v. City of Woodville,* No. W85–0088(B) (S.D.Miss. Apr. 1, 1986) (motion for summary judgment). Since, the city's argument pro-

---

* District Judge of the Northern District of Texas, sitting by designation.

ceeds, the plaintiffs already possess the remedy sought, there exists no genuine issue of material fact and the city is entitled to judgment as a matter of law.

The district court agreed, and granted the city's motion. The court found that "[t]he salient fact of the matter is that under the current system, Blacks are not only in the majority but that the City of Woodville as a whole is a 'safe' district where Blacks constitute, as a matter of law, an *effective majority* of the voting age population." *Monroe v. City of Woodville,* 636 F.Supp. 423, 424 (S.D.Miss.1986) (emphasis in original). Citing the Seventh Circuit's careful analysis of appropriate remedies to minority vote dilution in *Ketchum v. Byrne,* 740 F.2d 1398 (7th Cir. 1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985), the district court noted that federal courts have widely accepted that a 60 percent majority of the voting age population in a given district provides minorities a fair opportunity to participate in the political process and to elect a candidate or candidates of their choice. Since blacks already constitute 60 percent of the city's voting age population, "any remedial action from a federal court abolishing or modifying the at-large system would be presumptively inappropriate." *Monroe,* 636 F.Supp. at 424. The court further pointed out that "[t]he meager evidentiary materials submitted ... in response to Defendants' Motion do not contain specific facts which point to any 'built-in' bias or to any purposeful discrimination regarding Woodville's at-large system of electing aldermen." *Id.* at 425. The court therefore entered judgment in favor of the city, and this appeal followed.

## II.

A grant of summary judgment under Federal Rule of Civil Procedure 56 is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the party opposing the motion, "show that there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law." Fed.R. Civ.P. 56(c); *e.g., Phillips Oil Co. v. OKC Corp.,* 812 F.2d 265, 272 (5th Cir.1987). A federal appellate court, on appeal from a summary judgment, reviews the record according to the same legal standard as the district court in determining whether the entry of summary judgment was warranted. *Id.*

The Supreme Court has recently instructed that, where the nonmovant would bear the burden of proof at trial, the party moving for summary judgment has the burden, not of producing evidence demonstrating the absence of a genuine issue of material fact, but of " 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). In the instant case, the sole basis for the city's motion was its theory that, even conceding liability on the merits, the plaintiffs were not entitled to a remedy because blacks already constituted a significant majority of the city's voting age population. Because the district court rested its decision upon the city's theory and not upon an independent legal basis for summary judgment, *cf. id.* (district courts empowered to grant summary judgment *sua sponte*), our review of this appeal is necessarily limited to the sole ground for judgment upon which the city met its burden of identification: that is, its theory that the plaintiffs already possess the remedy sought.

A violation of the Voting Rights Act of 1965, as amended, is established "if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by ... [minority] citizens ... in that [such citizens] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973. Thus, in conceding a violation of the Act for the purposes of its motion, the city stipulates that its electoral processes are not equally open to blacks and that blacks have less opportunity than whites to

participate in the political process and elect representatives of their choice.

The city nonetheless contends that, even though *arguendo* it deprives blacks of their right to participate equally in the political process, the substantial black majority of Woodville's voting-age population prevents the district court from ordering relief under the Act. The city points out that federal courts have widely accepted that, absent extraordinary circumstances, an electoral district in which minorities comprise 60 percent of the voting-age population should be considered a "safe" district where minorities have a reasonable chance of electing a candidate who will respond to their needs. *See, e.g., Mississippi v. United States*, 490 F.Supp. 569, 575 (D.D.C. 1979) (three-judge panel), *aff'd*, 444 U.S. 1050, 100 S.Ct. 994, 62 L.Ed.2d 739 (1980). Since blacks already comprise 60 percent of Woodville's voting-age population, the city argues, Woodville should be considered a black "safe" district unless sociological, electoral, or political information indicates that a larger black majority is required. *Cf. Ketchum v. Byrne*, 740 F.2d 1398, 1415–16 nn. 20 & 21 (7th Cir.1984) (indicating that 60% voting-age population norm should be adjusted upward or downward when the facts so warrant), *cert. denied*, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985). Yet, the city continues, the plaintiffs have failed to produce any evidence that a greater black majority would be necessary to create a safe district of Woodville, and therefore have failed to rebut the city's motion for summary judgment.

We find the city's concession of a violation of the Voting Rights Act to be both logically and factually inconsistent with its stance that Woodville is already a safe district. Our review of the usage of the term "safe district" in the relevant jurisprudence has convinced us that the term signifies nothing more or less than an electoral district in which a majority of the residents shares a politically significant characteristic or interest, and that majority is sufficiently large to make it likely that the district will elect a representative with the same characteristic or interest.[1] We

---

1. *See, e.g., Thornburg v. Gingles*, — U.S. —, 106 S.Ct. 2752, 2785, 2787, 92 L.Ed.2d 25 (1986) (describing as a "completely safe district" a district in "which blacks would constitute an overwhelming majority. The black voters in this district would be assured of electing a representative of their choice.") (O'Connor, J., concurring in the judgment); *Davis v. Bandemer*, — U.S. —, 106 S.Ct. 2797, 2809–10, 92 L.Ed.2d 85 (1986) ("To draw district lines to maximize the representation of each major party [in the Indiana Legislature] would require creating as many safe seats for each party as the demographic and predicted political characteristics of the State would permit. This in turn would leave the minority in each safe district without a representative of its choice. We upheld this 'political fairness' approach in *Gaffney v. Cummings*, [412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973)], despite its tendency to deny safe district minorities any realistic chance to elect their own representatives."); *Whitcomb v. Chavis*, 403 U.S. 124, 156, 91 S.Ct. 1858, 1875–76, 29 L.Ed.2d 363 (1971) ("The District Court's holding .... is expressive of the more general proposition that any group with distinctive interests must be represented in legislative halls if it is numerous enough to command at least one seat and represents a majority living in an area sufficiently compact to constitute a single-member district. This approach would make it difficult to reject claims of Democrats, Republicans, or members of any political organization ... who live in what would be safe districts in a single-member district system but who in one year or another, or year after year, are submerged in a one-sided multi-member district vote.") (footnotes omitted); *Seastrunk v. Burns*, 772 F.2d 143, 149, 151–52 (5th Cir.1985) ("Second, appellants alleged that an only 65 percent black voting majority within district 1–D was sufficient to ensure its 'safety' as a black seat on the Board; the 'excess' 25 percent of the black population within that district could thus have been put into a second, albeit not 'safe,' district, giving the black voters of the Parish more leverage in School Board elections.") (footnote omitted); *Marshall v. Edwards*, 582 F.2d 927, 931 (5th Cir.1978) ("'Our plan does provide for four districts, basically six, seven, eight and nine with black majorities respectively 86%, 99%, 64% and 93%. These four seats, by rule of thumb and practical application and knowledge, would be considered safe districts for the minority group in this parish.'") (quoting trial testimony of expert witness), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979); *see also* Howard & Howard, *The Dilemma of the Voting Rights Act—Recognizing the Emerging Political Equality Norm*, 83 Colum.L.Rev. 1615, 1615 (1983) ("A safe district is a district in which a large majority of the residents shares a certain politically significant characteristic or interest, thereby making it likely that the district will elect a representative with the same characteristic or interest.").

find it fundamentally inconsistent for the city to concede that its electoral system provides blacks less opportunity than whites to participate in the political process and elect representatives of their choice, yet at the same time to insist that blacks in Woodville are likely to elect the representative of their choice. The one fact that is clear on the meager record before us is that black candidates are unlikely to be elected to office in Woodville. Interpreted in light of the city's limited concession of a violation of section 2 due to dilution of black voting strength, this lack of success at the polls must be regarded, not as happenstance, but as the result of the city's electoral structure operating in conjunction with significant white bloc voting, and in spite of the existence of a politically cohesive black community which is sufficiently large and compact to constitute a majority in a single-member district. *See Thornburg v. Gingles,* — U.S. —, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1986) (setting forth elements of section 2 violation where dilution of minority votes by at-large system alleged). Viewed in the light most favorable to the plaintiffs, this record reveals a genuine issue of material fact as to whether Woodville, as presently constituted, is a safe district in which blacks are likely to elect the representatives of their choice.[2]

## III.

For the reasons discussed above, the judgment entered by the district court is REVERSED and this case is REMANDED for further proceedings.

As the Seventh Circuit implicitly acknowledged in *Ketchum,* the question of the size of the majority necessary to ensure the likelihood of minority success at the polls cannot be determined by a set formula, but must be evaluated on a case-by-case basis according to the political and other characteristics of the relevant population. *See* 740 F.2d at 1415–16 nn. 20 & 21.

2. Moreover, there is strong evidence that Congress intended that, where a violation of the Act is established, courts should make an affirmative effort to fashion an appropriate remedy for that violation. The legislative history to the 1982 amendments to the Voting Rights Act states that:

The basic principle of equity that the remedy fashioned must be commensurate with the right that has been violated provides adequate assurance, without disturbing the prior case law or prescribing in the statute mechanistic rules for formulating remedies in cases which necessarily depend upon widely varied proof and local circumstances. The court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice.

S.Rep. No. 417, 97th Cong., 2d Sess. 31, *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 208 (footnote omitted). This counsel from the legislative history strengthens our conviction that, on this record, the district court's granting the city's motion for summary judgment was improper.

In its memorandum opinion and order, the court below, as an aside, intimated that the small physical size and population of Woodville might render impracticable the further division of that political body into single-member districts. On appeal, the city has not pursued this line of reasoning as an independent ground for affirming the district court's judgment. Given the meager record before us, we are in no position to address the merits of such a fact-specific argument.