890 F.2d 1423
 58 USLW 2364
 Sam WHITFIELD, Jr., and Linda Whitfield, P.L. Perkins,
Julious McGruder, Georgia M. Varner, Annie Sykes,
Ollie Jennings, Sam Bennett, Appellants,
v.
The DEMOCRATIC PARTY OF the STATE OF ARKANSAS, The State of
Arkansas Democratic Central Committee, The Phillips County
Democratic Central Committee, Phillips County Republican
Party Committee, Appellees.
 No. 88-1953.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 14, 1989.
Decided Dec. 7, 1989.
 
 Carol Lani Guinier, Philadelphia, Pa., for appellants.
 Tim Humphries, Little Rock, Ark., for appellees.
 Before BEAM, Circuit Judge, BRIGHT, Senior Circuit Judge and HANSON,* District Judge.
 BEAM, Circuit Judge.
 
 
 1
 Whitfield and other appellants, black voters in Phillips County, Arkansas, challenge the district court's dismissal of their complaint. Whitfield sued the Democratic Party of Arkansas and others, alleging that a state statute which requires a general (runoff) primary election if one candidate does not receive a majority of the vote is both unconstitutional and in violation of section 2 et seq. of the Voting Rights Act of 1965, 42 U.S.C. Sec. 1973 et seq. (1982). We affirm in part and reverse in part.
 
 I. BACKGROUND
 A. Facts
 
 2
 The population of Arkansas is approximately 16.3 percent black. Approximately 47 of the 75 counties in Arkansas have black populations below this statewide percentage, and twenty-one counties are less than one percent black. Twenty-two counties have a black population over twenty-five percent.
 
 
 3
 The state has a history of official discrimination in its electoral process. Arkansas has used racially discriminatory voting practices such as statutory restrictions on the rights of blacks to vote, discriminatory literacy tests, poll taxes, a "whites only" Democratic primary, segregated polling places, and at-large elections. Perkins v. City of West Helena, Arkansas, 675 F.2d 201, 211 (8th Cir.), aff'd mem., 459 U.S. 801, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982). See also Smith v. Clinton, 687 F.Supp. 1310, 1317 (E.D.Ark.) (taking judicial notice of the history of electoral racial discrimination in Arkansas), aff'd mem., --- U.S. ----, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988).
 
 
 4
 The focus here is not only on the State of Arkansas, but also on Phillips County. While over fifty percent of the residents of Phillips County are black, black residents of legal voting age number less than fifty percent.[1] Statistics on education and income, indicators closely correlated with political participation, see Perkins, 675 F.2d at 211, reveal that blacks in Phillips County are on the average much less educated and far poorer than whites.
 
 
 5
 No black candidate has been nominated for or elected to a county-wide or city-wide office or to a state legislative position from Phillips County since the turn of the century. In the past two years, four black candidates have come in first in preferential primary elections in Phillips County, yet all four were subsequently unable to obtain the Democratic nomination because they were defeated by white candidates in general (runoff) primaries.
 
 
 6
 Racially polarized (bloc) voting is the norm in Phillips County. Whitfield's expert, who performed both extreme case analyses and bivariate ecological regression analyses on the fifteen county-wide, city-wide, and state legislative elections since 1984, testified that in all fifteen elections, voting was racially polarized as shown by the fact that black candidates were supported by an average of over ninety-four percent of black voters and, in most county-wide races, virtually no white voters supported black candidates.
 
 B. The Primary Election Runoff Requirement
 
 7
 The Arkansas Code sets forth the procedures for primary elections, Ark.Code Ann. Secs. 7-7-201 to -311 (1987), pursuant to amendment 29 of the Arkansas Constitution. Amendment 29 states:
 
 
 8
 Only the names of candidates for office nominated by an organized political party at a convention of delegates, or by a majority of all the votes cast for candidates for the office in a primary election, or by petition of electors as provided by law, shall be placed on the ballots in any election.
 
 
 9
 Ark. Const. amend. 29, Sec. 5 (emphasis added).
 
 
 10
 Whitfield is challenging section 7-7-202, which states:
 
 
 11
 (a) Whenever any political party shall, by primary election, select party nominees as candidates at any general election for any United States, state, district, county, township, or municipal office, the party shall hold a preferential primary election and a general primary election on the respective dates provided in Sec. 7-7-203(a) and (b).
 
 
 12
 (b) A general primary election shall not be held if there are no races where three (3) or more candidates qualify for the same office or position as provided in subsection (c) of this section, unless a general primary election is necessary to break a tie vote for the same office or position at the preferential primary.
 
 
 13
 (c) If there are no races where three (3) or more candidates qualify for the same office or position, only the preferential primary election shall be held. If all nominations have been determined at the preferential primary election, or by withdrawal of candidates as provided in Sec. 7-7-304(a) and (b), the general primary election shall not be held.
 
 
 14
 Ark.Code Ann. Sec. 7-7-202 (1987).
 
 
 15
 Under the current system, candidates for a particular party nomination run in preferential party primary elections. If three or more candidates run in the preferential primary, and none receives a majority of the votes, the top two candidates are required to run in a subsequent general (runoff) primary election. Both appellants and appellees acknowledge that, in Arkansas, the Democratic nomination is tantamount to election for most local and state offices.
 
 C. The District Court Holding
 
 16
 The district court dismissed Whitfield's constitutional challenge to section 7-7-202 because the court found no racially discriminatory purpose or intent underlying the primary runoff enactments. The court also rejected Whitfield's argument that the runoff had been maintained for racially discriminatory purposes. Whitfield, 686 F.Supp. at 1370.
 
 
 17
 The district court denied relief under the Voting Rights Act, stating that the plaintiffs failed to convince the court that section 2 applies to runoff provisions such as those found in section 7-7-202, given the demographics of the area and the manner in which the runoffs operate. The court also concluded that, even if section 2 does apply, the plaintiffs failed to sustain their burden of proof that section 7-7-202 results in blacks having less opportunity than whites to participate in the political process or to elect candidates of their choice. Id. at 1387.
 
 II. DISCUSSION
 A. Constitutional Violation
 
 18
 Whitfield argues that section 7-7-202 was enacted and has been maintained with discriminatory intent and thus violates the Equal Protection Clause of the fourteenth amendment. "[I]n order for the Equal Protection Clause to be violated, 'the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose.' " Rogers v. Lodge, 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982) (quoting Washington v. Davis, 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976)). "The ultimate issue in a case alleging unconstitutional dilution of the votes of a racial group is whether the [voting scheme] under attack exists because it was intended to diminish or dilute the political efficacy of that group." Rogers, 458 U.S. at 621, 102 S.Ct. at 3277-78 (quoting Nevett v. Sides, 571 F.2d 209, 226 (5th Cir.1978), cert. denied, 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980)).
 
 
 19
 A plaintiff challenging the constitutionality of a discriminatory electoral system must prove, by a preponderance of the evidence, that the defendant had racially motivated discriminatory intent in enacting or maintaining a voting practice. Perkins, 675 F.2d at 207; Nevett, 571 F.2d at 219. See also City of Carrollton Branch of the NAACP v. Stallings, 829 F.2d 1547, 1549 (11th Cir.1987), cert. denied sub nom. Duncan v. City of Carrollton, Georgia, Branch of the NAACP, 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); Wesley v. Collins, 791 F.2d 1255, 1262 (6th Cir.1986) (citations omitted). The trial court must consider "the totality of the circumstances" surrounding the alleged discriminatory practice in order to "determine whether the [challenged voting practice] was created or maintained to accord the members of the allegedly injured group less opportunity than other voters to participate meaningfully in the political process and elect [candidates] of their choice." Perkins, 675 F.2d at 209. "Because a finding of intentional discrimination is a finding of fact, the standard governing appellate review of a district court's finding of discrimination is [the clearly erroneous standard]." Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).
 
 
 20
 Whitfield provided the following evidence of racially discriminatory purpose. First, in 1939, at the time the primary runoff statute was adopted in its original form, Arkansas was a one-party state and the Democratic white primary was the only election that mattered. At the same time, an amendment to repeal a poll tax, which effectively disenfranchised blacks, failed. Second, after the white primary was held unconstitutional by the Supreme Court in the 1940s, the majority runoff system was retained to diminish black electoral influence. Third, the recodification of the Election Code in 1969 maintained the use of runoffs in primary elections. Fourth, in 1975 and 1983, attempts were made to also impose general election runoffs in response to the presence of black candidates in multi-candidate municipal contests. Finally, the current version of the statute was passed in 1983; two members of the legislature who served that year testified that the statute was intended to prevent blacks from winning further elections due to splits in the white community.
 
 
 21
 Based on a detailed review of the evidence surrounding the enactment of section 7-7-202 and the adoption of amendment 29 of the Arkansas Constitution, the district court held that Whitfield failed to establish his constitutional challenge to the Arkansas primary runoff requirement. Whitfield, 686 F.Supp. at 1374. The court noted that the majority vote requirement set forth in the state constitution was initiated through petitions (not by the legislature) and adopted by a vote of the people of the State of Arkansas at a time when blacks in Arkansas could not vote in the Democratic primary. The requirement could not have been maintained by the General Assembly with discriminatory intent because nothing in the record indicates that the legislature had the power to repeal amendment 29. In fact, in 1940, the Arkansas legislature proposed an amendment to repeal amendment 29, but that effort was soundly defeated by the popular vote. Id. at 1371. The court determined that "the issue is beyond direct legislative reach" and thus concluded that the actual purpose behind the enactment of section 7-7-202 was the stated purpose: "to insure that no one was nominated as a candidate of the Democratic Party who had not received a majority of the votes cast." Id. at 1370-71.
 
 
 22
 We agree that discriminatory legislative intent has not been adequately established, given the time frame and political background of amendment 29. While the legislators may have enacted more recent statutes which continue to advocate primary runoffs, they were mandated to continue the use of runoffs by the state constitution and voter tendencies present in Arkansas. The district court's conclusion that discriminatory intent was not proved is not clearly erroneous. Thus, we affirm that portion of the district court opinion.
 
 B. Violation of the Voting Rights Act
 
 23
 Section 2 of the Voting Rights Act provides:
 
 
 24
 Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation
 
 
 25
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, * * * as provided in subsection (b) of this section.
 
 
 26
 (b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 27
 42 U.S.C. Sec. 1973 (1982).
 
 1. Applicability of the Act
 
 28
 The Democratic Party urges us to affirm the district court's holding that section 2 of the Voting Rights Act does not apply to section 7-7-202. The Party notes that virtually all of the cases decided under section 2 deal with at-large elections or legislative districting matters. We conclude, however, that section 2 was not meant to apply only to cases challenging at-large election schemes and districting matters, although it is true that most of the previous section 2 cases concern these types of discriminatory voting practices.
 
 
 29
 The Senate Report emphasizes that section 2 is the "major statutory prohibition of all voting rights discrimination," prohibiting practices which "result in the denial of equal access to any phase of the electoral process for minority group members." S.Rep. No. 417, 97th Cong., 2d Sess. 30 reprinted in 1982 U.S.Code Cong. & Admin.News 177, 207 (emphasis added). Nowhere in the language of the statute did Congress limit the application of section 2 cases to those involving at-large elections or redistricting; in fact, the Senate Report specifically identifies "majority runoffs [which] prevent victories under a prior plurality system" as a "dilution scheme[ ] * * * employed to cancel the impact of the * * * black vote." Id. at 6, 1982 U.S.Code Cong. & Admin.News at 183.[2]
 
 
 30
 The district court stressed that majority rule is one of the underlying concepts of our democratic system. However, we agree with the Fifth Circuit that "[t]he fact that majority vote requirements may be commonplace does not alter the fact that Congress clearly did conclude that such provisions could serve to * * * dilute the voting strength of minorities." Westwego Citizens for Better Government v. City of Westwego, 872 F.2d 1201, 1212 (5th Cir.1989) (citing Thornburg v. Gingles, 478 U.S. 30, 56, 106 S.Ct. 2752, 2769, 92 L.Ed.2d 25 (1986)).
 
 
 31
 Furthermore, the Supreme Court has explicitly stated that "[s]ubsection 2(a) prohibits all States and political subdivisions from imposing any voting qualifications or prerequisites to voting, or any standards, practices, or procedures which result in the denial or abridgement of the right to vote of any citizen who is a member of a protected class of racial and language minorities." Gingles, 478 U.S. at 43, 106 S.Ct. at 2762 (emphasis in original). The Court has specifically recognized majority vote requirements as "potentially dilutive electoral devices." Id. at 56, 106 S.Ct. at 2769. Here, that potential has been realized.
 
 
 32
 The district court held, "as a matter of law, that the undisputed population figures here are not such as will permit the plaintiffs to challenge the primary runoff law of the state of Arkansas as a violation of Section 2 of the 1965 Voting Rights Act, as amended." Whitfield, 686 F.Supp. at 1381. The court based this premise on "the circumstance that the voting age populations of blacks and whites in Phillips County is equal for practical purposes." Id. The court rejected the idea that "even where black voting populations equal or exceed white voting populations, blacks should nevertheless be considered a 'minority' because of the evidence that they have not participated in the past in the political processes of the county in as large a proportion as have whites." Id.
 
 
 33
 We disagree with the district court's analysis of this issue. The inquiry does not stop with bare statistics. Section 2 is not restricted to numerical minorities but is violated whenever the voting strength of a traditionally disadvantaged racial group is diluted. "[H]istorically disadvantaged minorities require more than a simple majority in a voting district in order to have * * * a practical opportunity to elect candidates of their choice." Smith v. Clinton, 687 F.Supp. 1361, 1362 (E.D.Ark.), aff'd mem., --- U.S. ----, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988). We conclude, as a matter of law, that a numerical analysis of the voting age population in a particular geographic area does not automatically preclude application of section 2 to a challenged voting practice used in that area.
 
 
 34
 Furthermore, the parties stipulated to census figures showing that blacks do constitute a minority of the voting age population in Phillips County (47%). In addition, at every election studied by Whitfield's expert, blacks turned out at a lower rate than whites. Thus, although theoretically a black candidate may be able to muster a majority of the votes in Phillips County, the practical reality is that there simply are not enough blacks voting in each election to allow a victory for a black candidate.
 
 
 35
 While the district court believes that the registration level of voting age blacks is equal, or nearly equal, to that of voting age whites in some of the challenged geographic areas, we find that conclusion to be speculative. Whitfield points out that the census data in the record contains no references whatsoever to registration rates, and indeed, Arkansas apparently does not keep such data by race. Appellants' Brief at 12 n. 12. The district court also supports its conclusion by relying on the fact that efforts to register blacks have greatly increased in recent years and black citizens no longer face harassment and intimidation in registering and voting. However, if we were also permitted to speculate, we would probably conclude that even with these changes in Arkansas politics, the voting statistics show that black registration numbers are still significantly lower than white voter levels. Blacks could not vote at all in the State of Arkansas until 1940, and as such blacks have had less than fifty years to increase their voter numbers. Their registration level could hardly be equal to that of the white community, which has been able to recruit and assemble voters since the creation of the state.
 
 2. Discriminatory Results
 
 36
 The district court also concluded that, even if section 2 did apply to majority runoff requirements in Phillips County, Whitfield failed to prove that, based on a totality of the evidence, section 7-7-202 results in discrimination against blacks in Phillips County. We disagree.
 
 
 37
 Although the district court apparently recognized that "plaintiffs need not show that the challenged voting practice or procedure was the product of purposeful discrimination," Whitfield, 686 F.Supp. at 1374, we believe the court failed to properly analyze the runoff requirement in light of the results-oriented test articulated in the Senate Report. Rather, it appears that the district court made a combined analysis of the discriminatory intent underlying section 7-7-202 and the cause and effect relationship between the runoff requirement and election results in Phillips County. This analysis circumvents the true issue: whether the challenged voting practice, a primary election runoff requirement, results in blacks in Phillips County having less of an opportunity to participate in the political process and elect representatives of their choice.
 
 
 38
 Throughout the legislative history of the 1982 amendment to section 2, Congress emphasizes that a violation of this portion of the Voting Rights Act may be ascertained through a results-oriented analysis. The Senate Report states that one of the objectives of the 1982 amendment was "to amend the language of Section 2 in order to clearly establish the standards intended by Congress for proving a violation of that section." S.Rep. No. 417 at 2, 1982 U.S.Code Cong. & Admin.News at 178. The Report then elaborates on this stated purpose:
 
 
 39
 This amendment is designed to make clear that proof of discriminatory intent is not required to establish a violation of Section 2. * * * The amendment also adds a new subsection to Section 2 which delineates the legal standards under the results test * * *.
 
 
 40
 This new subsection provides that the issue to be decided under the results test is whether the political processes are equally open to minority voters.
 
 
 41
 Id. at 2, 1982 U.S.Code Cong. & Admin.News at 179. The Report reiterates that the legal standard set forth by the amendment to section 2 does not require proof of discriminatory purpose and thus a minority plaintiff may establish a section 2 violation by showing that the challenged electoral practice results in denial of equal access to the political process. Id. at 15-17, 27, 1982 U.S.Code Cong. & Admin.News at 192-94, 205.
 
 
 42
 The Supreme Court has recognized Congress's intent to establish a results test, stating:
 
 
 43
 The Senate Report which accompanied the 1982 amendments elaborates on the nature of Sec. 2 violations and on the proof required to establish these violations. First and foremost, the Report dispositively rejects the position of the plurality in Mobile v. Bolden, 446 U.S. 55 [100 S.Ct. 1490, 64 L.Ed.2d 47] (1980), which required proof that the contested electoral practice or mechanism was adopted or maintained with the intent to discriminate against minority voters. The intent test was repudiated for three principal reasons--it is "unnecessarily divisive because it involves charges of racism on the part of individual officials or entire communities," it places an "inordinately difficult" burden of proof on plaintiffs, and it "asks the wrong question." The "right" question, as the Report emphasizes repeatedly, is whether "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice."
 
 
 44
 Gingles, 478 U.S. at 43-44, 106 S.Ct. at 2762-63 (quoting S.Rep. No. 417 at 2, 15-16, 27, 28, 36) (footnotes omitted).
 
 
 45
 Based on the clear language of the Senate Report and the Supreme Court's subsequent verification of the results test, we reject the inferences made by the district court that Whitfield's failure to prove discriminatory intent under section 2 results in a dismissal of his claim. While proof of intent may be used to show a violation of section 2, S.Rep. No. 417 at 27 & n. 108, 1982 U.S.Code Cong. & Admin.News at 205, such proof is not required of a plaintiff under the statutory language.
 
 
 46
 The Gingles Court explained that "a court must assess the impact of the contested structure or practice on minority electoral opportunities" on the basis of the plaintiff's proof as to a variety of factors, as set forth in the Senate Report. Gingles, 478 U.S. at 44-45, 106 S.Ct. at 2763-64. "Typical factors" include (1) the extent of any history of official voting discrimination, (2) the extent of racially polarized voting, (3) the extent to which the state or political subdivision has used other voting practices or procedures which may enhance the opportunity for discrimination, (4) whether minority group members have been denied access to the candidate slating process, (5) the extent to which minority group members suffer the effects of discrimination "in such areas as education, employment and health, which hinder their ability to participate effectively in the political process," (6) whether political campaigning has been typified by racial appeals, and (7) the extent to which minority group members have been elected to public office. S.Rep. No. 417 at 28-29, 1982 U.S.Code Cong. & Admin.News at 206-07.
 
 
 47
 The district court reviewed the evidence presented by Whitfield as it related to the factors set forth in the Senate Report. For five of the seven factors, the court made factual findings which favored the conclusion that section 2 had been violated in Phillips County. Specifically, the court found that (1) Arkansas has a long history of racial discrimination which has touched the rights of blacks to participate in the democratic process; (2) Phillips County has experienced "extreme racial polarization in voting" in recent years; (3) other than majority vote requirements, Phillips County has not used any other "discrimination-enhancing" voting practices in the recent past; (4) no evidence was submitted on this point; (5) Phillips County has experienced "devastating" effects of discrimination in the areas of education, employment, and health, because of "dire economic circumstances"; (6) although no evidence was presented of significant, overt or subtle racial appeals, race does play "a central role" in Phillips County politics and has "frequently dominated over qualifications and issues"; and (7) no black candidate has ever been elected to county-wide or state legislative office in Phillips County. Whitfield, 686 F.Supp. at 1383-85.
 
 
 48
 After adopting these findings, the district court reasoned that "the Senate Report factors more logically support proof relating to 'intent' issues than 'cause and effects' issues." Id. at 1382. However, this conclusion is contradicted by the language of the Senate Report. After noting that plaintiffs who choose to establish a section 2 violation on the basis of intent may do so through direct or indirect circumstantial evidence, the Report states, "If the plaintiff proceeds under the 'results test,' then the court would assess the impact of the challenged structure or practice on the basis of objective factors, rather than making a determination about the motivations which lay [sic] behind its adoption or maintenance." S.Rep. No. 417 at 27, 1982 U.S.Code Cong. & Admin.News at 205. Contrary to the district court's opinion, we conclude that the factors set forth by the Senate Report are to be used primarily as proof of a section 2 violation under the results test. See id. at 28, 1982 U.S.Code Cong. & Admin.News at 206.
 
 
 49
 The district court also held that Whitfield did not meet his burden of proof of showing a causal connection between the runoff requirement and the lack of minority electoral success. We again disagree. During the past four years, but for the runoff primary elections, four black candidates would have been the Democratic Party's nominee. The court infers that the actual cause of lack of success by black candidates was the lack of motivation on the part of black voters--apathy--and if black voters would turn out at the polls in high numbers, their candidates would not be defeated because forty-seven percent of the voting population is black and some crossover voting does occur. It seems to us, however, that these conclusions are based on two erroneous premises: (1) that plaintiffs must actually prove a causal link between the lack of black electoral success and the discriminatory system being implemented against them, and (2) as noted above, that the Senate factors do not apply to the cause and effect analysis.
 
 
 50
 We agree that a causal connection between the challenged practice, as it occurs within the political climate of the geographic area, and the diluted voting power of the minority must be established. Here, the proof is two-fold. First, the plaintiffs have proved that the majority vote requirement has impaired their ability to elect a candidate because blacks of voting age, although they are numerous in Phillips County, fail to turn out at the polls in numbers sufficient to meet a majority vote requirement. Second, the plaintiffs have established, through proof of Senate factors, that the political climate of Phillips County has caused the low voter participation, because "[o]nce lower socio-economic status of blacks has been shown, there is no need to show the causal link of this lower status on political participation." United States v. Dallas County Comm'n, 739 F.2d 1529, 1537 (11th Cir.1984). The Senate Report states:
 
 
 51
 [D]isproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown, and where the level of black participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.
 
 
 52
 S.Rep. No. 417 at 29 n. 114, 1982 U.S.Code Cong. & Admin.News at 207 (citations omitted).
 
 
 53
 The evidence adduced, the stipulated facts, and the district court opinion all confirm that blacks in Phillips County suffer from less education, less employment, lower income levels, and disparate living conditions as compared to whites. Blacks also suffer from the remnants of official discrimination in Arkansas.
 
 
 54
 [P]ast discrimination can severely impair the present-day ability of minorities to participate on an equal footing in the political process[,] * * * may cause blacks to register or vote in lower numbers than whites * * * [and] may * * * lead to present socioeconomic disadvantages, which in turn can reduce participation and influence in political affairs.
 
 
 55
 United States v. Marengo County Comm'n, 731 F.2d 1546, 1567 (11th Cir.), appeal dismissed, 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984).
 
 
 56
 Here, the district court required an improper burden of proof of causal relationships by holding, in effect, that the socioeconomic factors and the effects of discrimination did not hinder blacks' ability to participate in any legally significant way. See Dallas County Comm'n, 739 F.2d at 1537. "It is not necessary in any case that a minority prove such a causal link. Inequality of access is an inference which flows from the existence of economic and educational inequalities." Id. (citations omitted). See also Marengo County Comm'n, 731 F.2d at 1569 (holding that "when there is clear evidence of present socioeconomic or political disadvantage resulting from past discrimination, * * * the burden is not on the plaintiffs to prove that this disadvantage is causing reduced political participation, but rather is on those who deny the causal nexus to show that the cause is something else").
 
 
 57
 Furthermore, the district court improperly assumed that lack of motivation caused lower turnout at the Phillips County polls. See Gomez v. City of Watsonville, 863 F.2d 1407, 1416 (9th Cir.1988) (stating that the district court should have focused only on actual voting patterns rather than speculating on reasons why minority voters were apathetic), cert. denied, --- U.S. ----, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989); Dallas County Comm'n, 739 F.2d at 1536 (concluding that "[t]he existence of apathy is not a matter for judicial notice"); Marengo County Comm'n, 731 F.2d at 1568-69 (noting that "[b]oth Congress and the courts have rejected efforts to blame reduced black participation on 'apathy' "). Also, the internal documents in this case simply do not support such an assumption. While, as the district court recognized, blacks are working strenuously in Phillips County to register black voters and to encourage black voter participation, voter turnout is still low. Yet, black turnout at some of the general primary (runoff) elections did not drop as significantly as did white voter turnout, when compared with the preceding preferential primary. These factors indicate to us that black voters are not apathetic. We believe that other factors contribute to a lack of political participation which nonparticipation is significant enough to make a runoff election victory an impossibility for a black candidate.
 
 
 58
 The plaintiffs presented statistical and expert evidence on the lower social, educational, and employment conditions in Phillips County. Contrary to the district court's determination, we conclude that such evidence is relevant to prove cause and effect. Thus, without more, the plaintiffs adequately carried their burden of proof that the majority runoff requirement, as it operates in the political system of Phillips County, has caused blacks in that county to have less opportunity than whites to elect the candidate of their choice.[3]
 
 
 59
 The Senate Report states that the factors enumerated "will often be the most relevant ones," though in certain cases other factors may also be used to show vote dilution. S.Rep. No. 417 at 29, 1982 U.S.Code Cong. & Admin.News at 207. Here, a majority of the factors have been found by the district court to exist in Phillips County. Furthermore, the findings relating to the third and fourth factors do not weigh against the plaintiffs' proof. However, the final determination "of whether the voting strength of minority voters is * * * 'canceled out' " demands the court's "overall judgment, based on the totality of the circumstances and guided by those relevant factors in the particular case." Id. at 29 n. 118, 1982 U.S.Code Cong. & Admin.News at 207. We conclude that, based on the proof set forth by Whitfield and the totality of the circumstances in Phillips County, a section 2 violation has been established under the results test.[4]
 
 C. Remedy
 
 60
 We are well aware of the difficulty of fashioning a remedy for Phillips County alone, while allowing the other counties of Arkansas to continue implementing a majority vote runoff requirement for primary elections. However, the evidence requires just such a remedy, and courts have created remedial orders which affect only one legislative district, while affecting no other portion of the Arkansas state legislative structure. See Smith v. Clinton, 687 F.Supp. at 1311; Smith v. Clinton, 687 F.Supp. at 1362 (rejecting the argument that any plan affecting only a single legislative district would interfere with the state-wide scheme of apportionment).
 
 
 61
 Where, as here, a violation of the Voting Rights Act has been established, "courts should make an affirmative effort to fashion an appropriate remedy for that violation." Monroe v. City of Woodville, Mississippi, 819 F.2d 507, 511 n. 2 (5th Cir.1987) (per curiam), cert. denied, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988). The legislative history of the Act states:
 
 
 62
 The basic principle of equity that the remedy fashioned must be commensurate with the right that has been violated provides adequate assurance, without disturbing the prior case law or prescribing in the statute mechanistic rules for formulating remedies in cases which necessarily depend upon widely varied proof and local circumstances. The court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and to elect candidates of their choice.
 
 
 63
 S.Rep. No. 417 at 31, 1982 U.S.Code Cong. & Admin.News at 208 (footnote omitted). In sum, " 'the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.' " Ketchum v. Byrne, 740 F.2d 1398, 1412 (7th Cir.1984) (quoting Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965)), cert. denied sub nom. City Council v. Ketchum, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985).
 
 
 64
 We agree with the Seventh Circuit that it is not the proper role of an appeals court to formulate its own remedial plan "or to dictate to a district court minute details of how such a plan should be devised." Ketchum, 740 F.2d at 1412. Therefore, we remand this case to the district court with directions to formulate an appropriate remedy for violation of the Voting Rights Act in Phillips County. We instruct the district court to limit its remedy to within the borders of Phillips County, since the evidence requires such a limitation.
 
 
 65
 We are well aware of the district court's concerns that elimination of the primary runoff requirement may not provide a total solution to the problem of the inability of black candidates to be elected in Phillips County and, indeed, may perpetuate racially polarized voting there. However, the majority vote requirement has, up to this point, prevented blacks from electing the candidates of their choice, and so, the elimination of that requirement is mandated by section 2. While the duties of a district judge are multitudinous, accurately forecasting the future is not one of them. Legislators are responsible for the results stemming from their decision-making. Thus, these potential problems are for Congress, not the courts, to solve. If the remedy fashioned for Phillips County serves to intensify the problem, as the district court anticipates, then the Congress will have to reevaluate section 2 as it is applied to realistic voting situations and the realities of political life in America.
 
 III. CONCLUSION
 
 66
 Section 2 was broadly written to protect minorities from disparate voting practices and procedures, including majority vote requirements. The Gingles Court stated that "[t]he essence of a Sec. 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Gingles, 478 U.S. at 47, 106 S.Ct. at 2764. We determine that this definition encompasses the Phillips County situation.
 
 
 67
 Therefore, while we affirm the district court's conclusion that Whitfield failed to prove his constitutional claim, we reverse the court's conclusion that section 2 of the Voting Rights Act of 1965, as amended in 1982, is inapplicable. We conclude that section 2 is violated by the application of Ark.Code Ann. Sec. 7-7-202 to Phillips County, Arkansas. Thus, we remand to the district court for determination of the appropriate remedy in accordance with the instructions set forth in this opinion.
 
 
 68
 HANSON, Senior District Judge, concurring.
 
 
 69
 I write separately to express my concern over the remedy that will be required by this ruling. Although we have left the remedy unspecified, it will necessarily leave Phillips County, Arkansas, with a voting procedure that, at least temporarily, varies from that used in the rest of the state.[1] This is a situation which I believe courts should avoid whenever possible because the fragmentation of state law is a grave matter. There is, however, no way to avoid this situation in this case.
 
 
 70
 The Fourteenth and Fifteenth Amendments to the United States Constitution undeniably vest Congress and the Judiciary with the power to end any and all state voting procedures which abridge the rights of minority citizens to vote. City of Rome v. United States, 446 U.S. 156, 173-79, 100 S.Ct. 1548, 1559-63, 64 L.Ed.2d 119 (1979); South Carolina v. Katzenback, 383 U.S. 301, 323-27, 86 S.Ct. 803, 815-18, 15 L.Ed.2d 769 (1965). Congress, acting within the authority granted by these provisions of our Constitution, has mandated that no state voting procedure can be allowed to stand which "results" in the dilution of the voting strength of a traditionally disadvantaged racial group in "any state" or "subdivision" thereof. See 42 U.S.C. Sec. 1973 (1982). I am bound to follow this mandate.
 
 
 71
 In this case, a most able and fair district judge has found inequalities which indicate a violation of this law in Phillips County, Arkansas. There is no doubt in my mind, that under the present factual situation, the primary run-off requirement dilutes the votes of Phillips County blacks in a manner proscribed by the Voting Rights Act. Further, I am not prepared to accept as a major premise in syllogistic argument the premise, which I believe underlies Judge Bright's dissent, that there can be no injustice where majority vote rules.
 
 
 72
 I do not know that Congress, in its passage of the 1982 Amendments to the voting Rights Act and adoption of the "results" test, fully recognized that the statute as crafted would open the door to the fragmentation of state law when a statewide law is shown to result in a dilution of minority voting strength in only one subdivision of a state. I assume, however, that Congress did intend the natural consequences of its actions. If they did not, it is up to Congress to act pursuant to their wisdom to change the law--not this court. Thus, because the people of this country, through the Congress and the Constitution, have decreed that no state voting procedure can be allowed to stand which results in the dilution of the voting rights of racial minorities in a subdivision of a state, I join in striking down the application of the law at issue in Phillips County.
 
 
 73
 I harbor no illusions that this ruling enforcing the Voting Rights Act will dissolve the racial prejudice which continues to haunt Phillips County. There are problems in social and political human relations which defy solution by legislative action. And, as noted by Justice Holmes, legislative efforts to solve these problems often create uncertainties over which judges, with all their frailties, labor. Racial problems, are now, and have been, one of these most difficult areas of concern. Thus, although I join in striking down the barrier in this case, it seems to me that such problems can only be truly "solved" by time, patience, and most importantly, education.
 
 
 74
 My study and research on this matter does not disclose a perfect precedent for that action which we take today.
 
 
 75
 BRIGHT, Senior Circuit Judge, concurring in part and dissenting in part.
 
 
 76
 I write separately to express my disagreement with the reasoning and conclusion of the majority regarding section 2 of the Voting Rights Act. This case presents a voting rights challenge to the use of run-off primaries in elections for single-member offices, a procedure that without more does not dilute the opportunity of any group of voters to participate equally with other voters in the political processes leading to the nomination and election of public officials. Accordingly, I dissent.
 
 
 77
 Run-off primaries serve a basic principle of representative government: majority rule. States have always had the right to require that a majority of the voters support the winner of an election. While it is unquestionably true that run-off primaries combined with at-large elections or other dilutive electoral devices can produce discriminatory results, see Thornburg v. Gingles, 478 U.S. 30, 56, 106 S.Ct. 2752, 2769, 92 L.Ed.2d 25 (1986); City of Port Arthur v. United States, 459 U.S. 159, 167, 103 S.Ct. 530, 535, 74 L.Ed.2d 334 (1983); Rogers v. Lodge, 458 U.S. 613, 627, 102 S.Ct. 3272, 3280, 73 L.Ed.2d 1012 (1982); White v. Regester, 412 U.S. 755, 766, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973), no federal court has ever taken the position that run-off primaries standing alone violate section 2. Moreover, the only court ever faced with this issue reached the opposite conclusion. Butts v. City of New York, 779 F.2d 141 (2d Cir.1985), cert. denied, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986). Because of the importance of the principle underlying run-off primaries, their long history and the absence of authority for the position the court today adopts, I would require explicit direction from Congress before invalidating the use of run-off primaries standing alone.
 
 
 78
 Section 2 of the Voting Rights Act is less than explicit. It states that an electoral procedure violates the Act if
 
 
 79
 based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by [minority voters] in that [minority voters] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.
 
 
 80
 42 U.S.C. Sec. 1973(b) (1982).
 
 
 81
 Section 2 forbids two types of electoral procedures: restrictive procedures that prevent members of a minority group from voting and procedures that have the effect of diluting minority voting strength. Butts, 779 F.2d at 148. In this case we confront the issue whether the use of run-off primaries standing alone dilutes minority voting strength. This issue does not lend itself to easy analysis because the phrase "vote dilution" "suggests a norm with respect to which the fact of dilution may be ascertained." Mississippi Republican Executive Comm. v. Brooks, 469 U.S. 1002, 1012, 105 S.Ct. 416, 422-23, 83 L.Ed.2d 343 (1984) (Rehnquist, J., dissenting from summary affirmance). No such norm exists.
 
 
 82
 The Senate Report accompanying the 1982 amendments to the Act set forth a list of "typical" factors relevant to the existence of a section 2 violation. S.Rep. No. 417, 97th Cong., 2d Sess. 28-29, reprinted in 1982 U.S.Code Cong. & Admin.News 177, 206-07. While the Supreme Court discussed these factors with approval in Thornburg v. Gingles, the Court nevertheless observed
 
 
 83
 that this list of typical factors is neither comprehensive nor exclusive. While the enumerated factors will often be pertinent to certain types of Sec. 2 violations, particularly to vote dilution claims, other factors may also be relevant and may be considered. Furthermore, the Senate Committee observed that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other. Rather, the Committee determined that "the question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality,' " and on a "functional" view of the political process.
 
 
 84
 478 U.S. at 45, 106 S.Ct. at 2763-64 (citing S.Rep. No. 417, 97th Cong., 2d Sess. 29, reprinted in U.S.Code Cong. & Admin.News at 206-07) (footnote and citations omitted). In this case, the majority does not conduct a searching evaluation but simply adds up a number of factors and concludes that a violation has occurred. Moreover, the majority fails to recognize that the district court conducted an appropriate evaluation.
 
 
 85
 In analyzing the effect of the run-off primary on the nomination of black candidates, District Judge Eisele quoted from the work of Professor Harold Stanley:
 
 
 86
 The likelihood of black nominees gaining a plurality of the primary vote in a crowded field seems enticing enough to encourage some to argue for ending the runoff. However, in majority black districts--as supporters of the runoff point out--the lack of a runoff might cause several black candidates to split the black vote and allow a white candidate to gain a plurality nomination. Thus, the runoff can protect and promote black political prospects in majority black districts.
 
 
 87
 Whitfield v. Democratic Party, 686 F.Supp. 1365, 1378 (E.D.Ark.1988) (quoting Stanley, Runoff Primaries and Black Political Influence, in Blacks in Southern Politics 259, 262-63 (1987)). Other commentators agree that invalidating the use of run-off primaries may hamper the ability of black voters to nominate their preferred representatives. McDonald, The Majority Vote Requirement: Its Use and Abuse in the South, 17 Urb.Law. 429, 437-38 (1985); Butler, The Majority Vote Requirement: The Case Against Its Wholesale Elimination, 17 Urb.Law. 441, 454 (1985). The able district judge cited evidence in the record to support his conclusion that the use of run-off primaries does not produce discriminatory effects: "The blacks have a voting age population majority in some of the Justice of the Peace districts in Phillips County. If two or more blacks chose to run in the primary and only one white, then the same possibility, i.e., of a minority white plurality nominee, would occur." Whitfield, 686 F.Supp. at 1378. District Judge Eisele, residing in the state of Arkansas and familiar with its political processes, is in a far better position than we appellate judges to evaluate whether the run-off primary denies black voters an equal opportunity to nominate candidates of their choice.
 
 
 88
 Judge Eisele also reasoned that the existence of the run-off primary has the effect over time of easing racial polarization in voting. "[P]lurality-win statutes or rules promote racial polarization and separation. Run-off provisions promote communication and collaboration among the various constituencies by which coalitions are built." Whitfield, 686 F.Supp. at 1386. In support of this statement, Judge Eisele observed:
 
 
 89
 For Democratic candidates, nomination rules that encourage the seeking of biracial support promote prospects for election. Retaining the runoff can lead to more black-white coalitions that back Democratic candidates who make successful biracial appeals. Courting and composing such biracial coalitions require a politics that is capable of reducing racial polarization, rather than reinforcing it. Such political cooperation between the races provides a more promising basis for collaboration on the eventual nomination and election of southern black candidates. On the other hand, eliminating the runoff where strong racial polarization exists--even if this would produce more black nominees (which seems unlikely)--should mean continued racial polarization....
 
 
 90
 Id. at 1386 (quoting Stanley, Runoff Primaries and Black Political Influence, in Blacks in Southern Politics 259, 264 (1987)). Racial polarization needs discouragement not enhancement. We should avoid any conclusion, such as the one the majority reaches today, that has the effect of continuing racial polarization in voting.
 
 
 91
 In addition to failing to recognize that the determination of a section 2 violation depends on a searching evaluation of the political process, the majority opinion contains a second flaw: none of the authority cited by the majority supports a conclusion that section 2 applies to run-off primaries standing alone. The majority refers to the Supreme Court's recognition that majority voting requirements are "potentially dilutive electoral devices...." Thornburg v. Gingles, 478 U.S. at 56, 106 S.Ct. at 2769. But the Court in Gingles was referring to the use of majority vote requirements in connection with multi-member districts. The majority also refers to language in Westwego Citizens for Better Gov't v. City of Westwego, 872 F.2d 1201, 1212 (5th Cir.1989), that majority voting requirements "could serve to further dilute the voting strength of minorities." The Westwego court, however, was remanding to the district court for a determination of whether an at-large voting scheme diluted the voting strength of minorities in violation of section 2. The Westwego court was merely recognizing that a majority vote requirement combined with an at-large voting scheme could dilute minority voting strength. Finally, the majority states that the Senate Report that accompanied the 1982 amendments identified a number of "dilution schemes," including "majority run-offs...." S.Rep. No. 417, 97th Cong., 2d Sess. 6, reprinted in 1982 U.S.Code Cong. & Admin.News at 183. The quoted portion of the Senate Report, however, is discussing section 5, dealing with pre-clearance of legislative efforts to undermine the Act. Section 5 is obviously not at issue here and the Arkansas legislature enacted the run-off primary law long before passage of the Voting Rights Act.
 
 
 92
 As stated earlier, the only court to address the use of run-off primaries reached a conclusion different from the one the majority reaches today. Butts v. City of New York, 779 F.2d 141 (2d Cir.1985). Butts involved a voting rights challenge to a New York statute that required a run-off primary if no candidate received more than 40% of the vote in the general primary. In holding that in the absence of dilutive electoral procedures the run-off primary at issue did not violate section 2, the court stated:
 
 
 93
 Whereas, in an election to a multi-member body, a minority class has an opportunity to secure a share of representation equal to that of other classes by electing its members from districts in which it is dominant, there is no such thing as a "share" of a single-member office. The distinction is implicit in City of Port Arthur v. United States, 459 U.S. 159, 103 S.Ct. 530, 74 L.Ed.2d 334 (1982), where the Court struck down a run-off requirement that Port Arthur had appended to its at-large voting system for seats on the multi-member city council, but made no mention of a similar run-off requirement for the election of mayor. The latter run-off was not even challenged.
 
 
 94
 ... The rule in elections for single-member offices has always been that the candidate with the most votes wins, and nothing in the Act alters this basic political principle. Nor does the Act prevent any governmental unit from deciding that the winner must have not merely a plurality of the votes, but an absolute majority (as where run-offs are required when no candidate in the initial vote secures a majority) or at least a substantial plurality, such as the 40% level required by Sec. 6-162.
 
 
 95
 Id. at 148-49. The Butts rationale gives strong support to the district court's perceptive and well-reasoned opinion.[1]
 
 
 96
 For all of the reasons given above, I would affirm.
 
 
 
 *
 The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern District of Iowa, sitting by designation
 
 
 [1]
 According to the 1980 census, Phillips County had 34,772 residents. Of these, 16,100 (46.30%) were white and 18,410 (52.94%) were black. However, of the 22,110 residents age 18 and over, 11,542 (52.20%) were white and 10,393 (47.00%) were black. Earlier census figures show that these percentages are generally stable. Exhibit JX1 at 1-3, Whitfield v. Democratic Party, 686 F.Supp. 1365 (E.D.Ark.1988)
 
 
 [2]
 We recognize that this language in the Senate Report refers, in part, to section 5 of the Act which section deals with "preclearance" of changes in election laws in certain jurisdictions. Nonetheless, we believe this legislative discussion, which encompasses both special practices and general prohibitions clearly supports our analysis of congressional intent on the scope of section 2 of the Act
 
 
 [3]
 Judge Hanson's research in this matter turns up a significant factor which none of the parties has addressed through evidence or in briefs or oral argument; that is, that Arkansas election law does not preclude cross-party voting in runoff (general) primary elections. It is factually uncontested that virtually no white voters support black candidates in Phillips County
 Thus, the Phillips County runoff system permits white Republicans, if they have a mind to do so, to, at least in limited circumstances, support a white Democrat in a runoff primary and to further dilute black voting strength. This cross-over factor distinguishes and attenuates the holding in Butts v. City of New York, 779 F.2d 141 (2d Cir.1985) since Butts clearly dealt with a closed (no cross-over) runoff primary. While we subscribe to Chief Judge Oakes' panel dissent, which opinion fully supports our results, we believe that the precedential value of the majority opinion in Butts is erased when the cross-over component is added to the factual mix.
 
 
 [4]
 Whitfield has also asserted the argument that the district court erroneously dismissed the plaintiffs' challenge to the general election majority vote requirement. Before trial, the district court dismissed plaintiffs' claim, citing as one of its reasons lack of standing. Whitfield asserts that plaintiffs had standing because they are black citizens and registered voters. We disagree with this argument. We conclude that the challenge was properly dismissed because the plaintiffs lacked standing in that no black had ever participated as a candidate in an election covered by the general (multi-party) election runoff statute and they failed to allege that such elections have been discriminatory in Phillips County
 
 
 [1]
 It appears that the district court may receive some guidance on the potential breadth of the remedy available in this case by the ultimate disposition of Spallone v. United States, 856 F.2d 444 (2nd Cir.1988), cert. granted, --- U.S. ----, 109 S.Ct. 3211, 106 L.Ed.2d 562 (1989)
 
 
 [1]
 Judge (now Chief Judge) Oakes dissented in Butts, contending that while minority voters have no right to "a proportionate 'share' " of a single member office, "they do have a right not to be subject to any structural process that under the totality of circumstances deprives them of equal opportunity to field a candidate for one of those offices." 779 F.2d at 155 (Oakes, J., dissenting). Judge Oakes further opined that a run-off election after an open primary would not violate section 2. Id. (Oakes, J., dissenting). In footnote 3 of its opinion, the majority reveals that in this case Arkansas law does not prohibit cross-party voting. Thus, the Butts dissent seems not to support the opinion of the majority